IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs August 15, 2007

## MINDY SUE DODD v. STATE OF TENNESSEE

**Direct Appeal from the Circuit Court for Rutherford County**
**No. F-56340    James K. Clayton, Jr., Judge**

---

**No. M2006-02384-CCA-R3-PC - Filed October 10, 2007**

---

The petitioner, Mindy Sue Dodd, was convicted by a Rutherford County jury of first degree murder and conspiracy to commit first degree murder in the death of her husband, Sherman Henry Dodd. She received concurrent sentences of life in prison and twenty years. This court affirmed her convictions on direct appeal, and her application for permission to appeal to the Tennessee Supreme Court was denied. State v. Mindy S. Dodd, No. M2002-01882-CCA-R3-CD, 2003 WL 22999444, at *1 (Tenn. Crim. App. Dec. 23, 2003), perm. to appeal denied (Tenn. June 1, 2004). The petitioner sought post-conviction relief alleging, *inter alia*, denial of her constitutional right to effective assistance of counsel. After a hearing, the post-conviction court found that the petitioner had failed to show that her trial counsel was ineffective and dismissed her petition. Following our review of the record and the findings of the post-conviction court, we affirm the dismissal of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JERRY L. SMITH and JOHN EVERETT WILLIAMS, JJ., joined.

Thomas H. Potter, Nashville, Tennessee, for the appellant, Mindy Sue Dodd.

Robert E. Cooper, Jr., Attorney General and Reporter; Preston Shipp, Assistant Attorney General; and William C. Whitesell, Jr., District Attorney General, for the appellee, State of Tennessee.

### OPINION

### FACTS

In December 1999, Sherman Henry Dodd was shot to death by his nephew, James E. Smallwood. At the petitioner's trial, Smallwood described a conspiracy between himself and the petitioner to kill the victim.

Smallwood admitted killing the victim sometime between 11:00 p.m. December 30 and 1:00 a.m. December 31, 1999. He gave the following account: The victim gave Smallwood a ride from Hardee's, where Smallwood worked, to their home. After they arrived but while they were still in the victim's truck, Smallwood shot the victim in the right temple with a .38 caliber revolver that Smallwood said the [petitioner] had given to him. Smallwood left the truck and retrieved a Fruitopia bottle from a box outside the house. He said the [petitioner] had placed the bottle inside the box and had told him to use the bottle as a silencer and to use the box to dispose of everything else. Smallwood held the bottle against the victim's chest and shot through the bottle. He also wore rubber gloves which he said the [petitioner] had given to him.

Smallwood smoked some marijuana and drank a Pepsi. He then drove the truck away from the home, during which time he shot the victim three times in the back. He parked the truck at the Smyrna Square Shopping Center near the Hardee's where he worked. He left the victim in the car and locked the doors, taking the victim's wallet and keys in order to indicate a robbery had occurred.

Smallwood threw his jacket, rubber gloves, and the victim's wallet and keys into a trash container near Hardee's, knowing that it was picked up daily. However, he threw the box, the revolver, the revolver case, a purple bag in which the revolver was kept, and extra ammunition into another trash container. By his directions, the police were able to retrieve the items from the latter container.

Smallwood went to the Hardee's and called the [petitioner], telling her that "it's done." He said that she knew what he meant because they had talked about it for several days. He said the [petitioner] took him home.

Smallwood recounted a history of sexual depravity with the victim since Smallwood was eight or nine years old. He said that he also had sex with the [petitioner] at the victim's insistence and that the three of them would engage in sexual acts together. He said this continued nightly until he moved out of the victim's home in October 1999.

Smallwood said that he and the [petitioner] began discussing killing the victim in October. He said that the [petitioner] told him that she was growing tired of the victim because, among other things, he was making her have sex with other people with whom the victim worked. After Smallwood left the victim's house, he lived with his mother. However, he returned to the victim's house on December 26, 1999. The [petitioner] talked about leaving the victim, but she was afraid that she would have to leave her children. Smallwood said that the [petitioner] told him that they should go ahead and "take care" of the victim and asked him if he knew anyone who would kill the victim. Smallwood said that he telephoned someone who wanted

-2-

twenty-five thousand dollars. However, Smallwood said that the price later became two hundred fifty thousand dollars because of the victim's community and police connections. Smallwood said that within a few hours of his return to the victim's home in December, talk of killing the victim resumed with the [petitioner]. He said the [petitioner] told him that he would not believe all the things that the victim had put her through while Smallwood was gone and that the victim would want them to start having sex again. He said that she said the price for his friend was too high and asked him to do it. Smallwood stated that he ultimately told her that he would but that she would have to get a gun. He said the [petitioner] told him where the victim's gun was kept in the house.

Smallwood testified that the [petitioner] gave him a pair of rubber gloves and told him to use them to avoid getting gunpowder residue on his hands and from getting fingerprints in the truck. He said that she handed him a little case that contained a gun and the rubber gloves. The next day, Smallwood began working at Hardee's and he carried the gun with him. Smallwood said that when the victim drove him home that first night, Smallwood pulled the loaded gun out in the truck but could not carry through. He said that when they got home, he put the gun back into the bedroom closet as the victim always left it. Smallwood testified that the [petitioner] gave him the gun again the next day and was upset that he had not killed the victim. He said that she told him that it would be easy to do. He said he was too scared that evening to do it. Again, he put the gun back into the closet. On the next night, Smallwood killed the victim after the victim drove him home.

Smallwood testified that he and the [petitioner] devised a plan. Smallwood was to act as if the victim did not pick him up from work. He was to telephone the victim several times in order to create records that the victim did not answer. Smallwood was to call the [petitioner] at her place of work, Wal-Mart, and the [petitioner] was to call the victim's number several times as if she were trying to locate him. Smallwood said that on the night of the killing, the [petitioner] took him home, returned to work, and called the house about every forty-five minutes. Smallwood testified that he showed the [petitioner] the victim's truck on the night the victim was killed. He said that he pointed the truck out to her and that she drove by it to get a closer look. He stated that the [petitioner's] filing a report with the police the next day was part of the plan. Smallwood said he told police what happened.

Mindy S. Dodd, 2003 WL 22999444, at *1-2.

The petitioner did not testify at trial. At the close of the state's case-in-chief, trial counsel examined the petitioner *in camera* about her decision not to testify on her own behalf. Counsel questioned the petitioner in detail on whether her decision not to testify was freely, knowingly, and intelligently made. See Momon v. State, 18 S.W.3d 152 (Tenn. 1999). Trial counsel explained to the petitioner that if she did not testify the defense would not call Dr. Keith Caruso, a psychiatrist

-3-

hired by the defense to evaluate the petitioner, as a witness. The petitioner said that she understood this. Afterwards, the jury reconvened and the defense rested without offering any testimony or proof on the petitioner's behalf.

In 2004, the petitioner filed a *pro se* petition for post-conviction relief. Counsel was appointed, and two amended petitions were filed. Following an evidentiary hearing, the post-conviction court denied relief and dismissed the petition.

The petitioner raised twelve claims in her amended petitions for post-conviction relief. She claimed she was being held illegally because (1) her conviction was based in part on a coerced confession in contravention of Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602 (1966); (2) the grand jury that issued the indictments in her case was improperly empaneled; and (3) her case was detrimentally affected by negative pretrial publicity. She also alleged that her trial counsel was constitutionally ineffective in the following ways:

> (1) failure to assert her right to receive exculpatory evidence from the State under Brady v. Maryland, 373 U.S. 83, 83 S. CT. 1194 (1963);
>
> (2) "faulty advice, ineffective assistance and actions of her counsel";
>
> (3) failure to assert her due process right of presence at all pretrial proceedings;
>
> (4) failure to "discover evidence which would be of great assistance to her defense";
>
> (5) failure to adequately and sufficiently investigate the facts and circumstances of the case to discover and locate witnesses beneficial to the petitioner;
>
> (6) "failure to prevent prejudicial and irrelevant testimony regarding deviant and immoral sexual practices and other acts of moral turpitude from being adduced at trial . . .";
>
> (7) failure to object to the verdict of the jury, which found the petitioner guilty of both the charged offenses and the lesser-included offenses of those crimes;
>
> (8) stipulation to the qualifications of the medical examiner as an expert in the determination of death; and
>
> (9) failure to request clarification of an ambiguous statement made by the trial court to the jury.

At the post-conviction evidentiary proceeding, the petitioner testified in varying detail as to each of these claims, except for the issue of improper grand jury impanelment. However, it appears that on appeal she has chosen to pursue only the second of her ineffective assistance claims–that is, whether

trial counsel was ineffective by giving faulty advice and failing to present proof at trial. Accordingly, all other alleged grounds for relief have been waived. See Tenn. R. App. P. 13(b) ("Review generally will extend only to those issues presented for review.").

At the evidentiary hearing, trial counsel testified that he had been a district public defender since 1989 and was appointed to represent the petitioner at trial. He said that he conducted interviews with a number of witnesses including the petitioner's mother, daughter, and codefendant. He believed that many of the witnesses could potentially have helped the petitioner's defense, but this potential was not realized because it depended upon a defense, battered women's syndrome, that counsel was unable to present absent the petitioner's testimony. Counsel thought his investigation was successful in that it demonstrated the merit of the battered women's syndrome defense to the State, leading to a more favorable plea offer shortly before trial.

Trial counsel testified that he explained to the petitioner that her decision not to testify would preclude the defense from introducing the testimony of her mother, stepbrother, and Dr. Caruso. He said that he met with the petitioner approximately twenty-two times, discussed the importance of presenting defense testimony to counter the prosecution, and explored the risks of both testifying and not testifying. Counsel prepared the petitioner to testify by reviewing potential direct and cross-examination questions with her. Counsel explained to the petitioner that if she did not testify, no other witnesses or testimony would be presented on her behalf. He said that he never told the petitioner it would be in her best interest not to testify or that testifying would ruin her defense.

On cross-examination from the State, trial counsel testified that he had practiced predominantly criminal law throughout his entire career and had litigated many complex jury trials. Counsel said he attempted to locate and use to the petitioner's benefit every witness of which he was aware. On the issue of presentation of defense testimony, the following colloquy occurred:

> [The State]: Okay. But based on expert advice to you in the form of Dr. Caruso, you could not reasonably present a position of diminished capacity or battered wife syndrome without her testimony[?]
>
> [Trial Counsel]: Yes, sir.
>
> [The State]: And he [Dr. Caruso] agreed with that. Did he want to testify absent her testimony?
>
> [Trial Counsel]: No, sir.
>
> [The State]: So you were hamstrung.
>
> [Trial Counsel]: Yes, sir.
>
> [The State]: By the decision of the [petitioner].

[Trial Counsel]: Yes, sir.

[The State]: And you did the best you could.

[Trial Counsel]: I feel I did, yes, sir.

[The State]: After a lot of work to prepare what most lawyers would call a complex defense.

[Trial Counsel]: It was a complex case, yes, sir.

[The State]: And you were prepared.

[Trial Counsel]: I believe so, yes, sir.

The petitioner was the only other witness at the post-conviction hearing. Asked if she knew the purpose of the *in camera* hearing where she affirmed her decision not to testify, the petitioner replied, "At the time I thought I understood, but to my knowledge I don't think I really understood why." She did not recall discussing the purpose of the hearing with trial counsel. She agreed that she had met with trial counsel approximately twenty-two times. The petitioner said that trial counsel mentioned a few questions that he might ask her but did not prepare her to answer those questions. She acknowledged that counsel reviewed some potential cross-examination questions. On her decision not to testify, the following exchange took place between post-conviction counsel and the petitioner:

Q: So, to your mind, were you prepared to testify?

A: No, sir.

Q: How did [trial counsel] prepare you for cross-examination?

A: I can't say that he did.

Q: Well, surely you discussed your case.

A: Yes, sir.

Q: And surely he explained to you witnesses that were expected to testify in your behalf.

A: Yes, sir.

Q:  And surely he discussed with you witnesses that were expected to testify for the State.

A:  Yes, sir.

Q:  But as far as anything specific, you don't recall or it just didn't happen?  Which is it?

A:  I don't recall that he prepared me in any way.

Q:  So it's your testimony then that you were not prepared by [trial counsel].

A:  Yes, sir.

. . . .

Q:  All right.  Did you expect to testify?

A:  Yes, sir.

Q:  Were you nervous about testifying?

A:  Yes, sir.

Q:  Were you afraid to testify?

A:  No, sir.

Q:  Why weren't you afraid to testify?

A:  Because it would have helped me to tell my story and what happened.

Q:  . . . [W]hen did you realize that your decision not to testify meant no testimony would be offered in your behalf at the trial?

A:  When my attorney, then my attorney [trial counsel], stood up and said that the defense rests.

Q:  So you were not prepared for that.

A:  No, sir.

Q:  You didn't know that was going to happen.

A: No.

The petitioner said that she expected Dr. Caruso to testify at trial and that she would have testified had she known that Dr. Caruso's testimony was contingent on her own. When asked to resolve the inherent conflict between this assertion and her testimony at the *in camera* hearing, the petitioner said she apparently was not paying attention at the *in camera* hearing and did not comprehend what was being asked of her, although she admitted she was not under the influence of drugs or alcohol at that time. Asked why she chose not to testify at trial, she responded that trial counsel told her it was in her best interest not to testify because the prosecution would harshly cross-examine her. She said she expected that, in spite of her decision, testimony and documentary evidence would be presented on her behalf to the jury. The petitioner expected her mother, stepbrother, and daughter to testify about the victim's abuse of her, although she could not explain how this testimony was relevant if she was not in any way involved in his murder.

On cross-examination, the petitioner admitted that trial counsel had explained to her that she would have to testify in order for Dr. Caruso's testimony to be admissible, yet maintained that she did not understand that Dr. Caruso's testimony would not go before the jury if she chose not to testify. Counsel for the State read a portion of the transcript of the *in camera* hearing, asking the petitioner to identify the parts of the hearing she did not understand. The petitioner replied that she understood that Dr. Caruso would not be testifying, but not that no evidence of the abuse theory would be presented the jury. The petitioner conceded that it was her decision not to testify but said she would have testified if she had known that trial counsel would not offer any other proof. She said she did not contemporaneously ask trial counsel why he rested without proof because she was "totally shocked" by this tactic. When questioned about her reason for requesting post-conviction relief, the petitioner stated, "I just – I just ask that the Court have mercy on me. I'm not asking for a new trial. I'm asking for a time cut or something."

Following the testimony of trial counsel and the petitioner, the post-conviction court took the matter under advisement and subsequently made the following findings of fact and conclusions of law:

> [The petitioner] was given a plea bargain offer to plea[d] guilty to facilitation of first degree murder with a sentence of 15 years at 30 percent as a Standard 30 percent offender. [The petitioner] refused that offer and went to trial on the indicted charges.
>
> [The petitioner] filed a pro se petition in which she agreed on cross-examination contained a number of allegations which were untrue [sic]. Her counsel, [trial counsel,] the district public defender, testified that it was her decision not to testify at the trial that she understood that Dr. Caruso would not testify if she did not testify. Further on cross-examination, she testified, and I quote, "I really don't want a new trial. I want a time – a time cut."

-8-

From all of the testimony adduced at the hearing, it's clear that [the petitioner] had competent counsel and that there is no clear and convincing evidence that would cloud that issue.

Therefore, her petition should be dismissed for failure to show any proof of prejudice.

## ANALYSIS

As we have set out, the petitioner raised a number of claims in her original and amended petitions for post-conviction relief and testified about these to varying degrees during the evidentiary hearing. On appeal, as we understand her arguments, she has limited her issues to the claims that counsel was ineffective for failing to call witnesses to testify about "the years of sexual abuse they [the petitioner and Smallwood] had suffered from the victim;" by resting the defense proof without presenting any witnesses; and for failing to adequately prepare her to testify at trial and fully explain the ramifications of her decision not to testify. The State responds that the petitioner is complaining of strategic decisions made by trial counsel; that she failed to present at the hearing those witnesses whose testimony, in her view, would have proved the abusive nature of the victim; that such evidence would have been irrelevant since the petitioner claimed she was not involved in the crime; and that the record shows that the petitioner waived her right to testify.

Post-conviction relief "shall be granted when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103 (2006). The petitioner bears the burden of proving factual allegations by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f) (2006). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. See Wiley v. State, 183 S.W.3d 317, 325 (Tenn. 2006). When reviewing factual issues, the appellate court will not reweigh the evidence and will instead defer to the trial court's findings as to the credibility of witnesses or the weight of their testimony. Id. However, review of a trial court's application of the law to the facts of the case is *de novo*, with no presumption of correctness. See Ruff v. State, 978 S.W.2d 95, 96 (Tenn. 1998). The issues of deficient performance of counsel and possible prejudice to the defense are mixed questions of law and fact and, thus, subject to *de novo* review by the appellate court. See Wiley, 183 S.W.3d at 325; State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999).

The right to effective assistance of counsel is safeguarded by the constitutions of both the United States and the State of Tennessee. See U.S. Const. Amend. 6; Tenn. Const. Art. I, § 9. In order to determine the competence of counsel, Tennessee courts have applied standards developed in federal case law. See State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that the same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The United States Supreme Court articulated the standard in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052 (1984), which is widely accepted as the appropriate

standard for all claims of a convicted petitioner that counsel's assistance was defective. The standard is firmly grounded in the belief that counsel plays a role that is "critical to the ability of the adversarial system to produce just results." Id. at 685, 104 S. Ct. at 2063. The Strickland standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

Id. at 687, 104 S. Ct. at 2064. The Strickland Court further explained the meaning of "deficient performance" in the first prong of the test in the following way:

> In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances. . . . No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant.

Id. at 688-89, 104 S. Ct. at 2065. The petitioner must establish "that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms." House v. State, 44 S.W.3d 508, 515 (Tenn. 2001) (citing Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996)).

As for the prejudice prong of the test, the Strickland Court stated: "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." 466 U.S. at 694, 104 S. Ct. at 2068; see also Overton v. State, 874 S.W.2d 6, 11 (Tenn. 1994) (concluding that petitioner failed to establish that "there is a reasonable probability that, but for counsel's errors, the outcome of the proceedings would have been different").

The reviewing court must indulge a strong presumption that the conduct of counsel falls within the range of reasonable professional assistance, see Strickland, 466 U.S. at 690, 104 S. Ct. at 2066, and may not second-guess the tactical and strategic choices made by trial counsel unless those choices were uninformed because of inadequate preparation. See Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). The fact that a strategy or tactic failed or hurt the defense does not alone support the claim of ineffective assistance of counsel. See Thompson v. State, 958 S.W.2d 156, 165 (Tenn. Crim. App. 1997). Finally, a person charged with a criminal offense is not entitled to perfect representation. See Denton v. State, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). As explained in Burns, 6 S.W.3d at 462, "[c]onduct that is unreasonable under the facts of one case may be perfectly reasonable under the facts of another."

The post-conviction court found that the petitioner failed to establish that trial counsel's performance was deficient. The court implicitly accredited the testimony of trial counsel that the petitioner made the decision not to testify with the understanding that this choice would preclude introduction of Dr. Caruso's testimony. Further, the court found that the petitioner offered no proof that any alleged error prejudiced her defense. Therefore, the post-conviction court concluded that the petitioner's claim of ineffective assistance of counsel was without merit.

First we will consider the petitioner's claims regarding her decision not to testify at the trial. At the *in camera* hearing, the following exchange between trial counsel and the petitioner took place, regarding whether the petitioner would testify:

Q: Now, do you understand that in this case you have an absolute right not to testify?

A: Yes, sir.

Q: No one can force you or threaten you or coerce you. You do not have to testify unless you want to, do you understand that?

A: Yes, sir.

Q: In addition, if you do not testify, the Court will tell the jury that they may not use the fact that you don't testify against you. It's a right you have, do you understand that, too?

A: Yes, sir.

Q: By the same token, you have the right to testify, and this is your trial, and you have the right to get in front of the jury and tell your side of the story and be heard. That's also a right that you have, do you understand that?

A: Yes, sir.

. . . .

Q: And in this case you've made a decision. I asked you to think about it overnight, and we talked about it again this morning. And you've made the decision not to testify, is that right?

A: Yes, sir.

Q: Now, just so the record is clear, you and I have discussed it. You've had the benefit of my thoughts on the matter, is that right?

-11-

A: Yes, sir.

Q: By the same token, did I tell you who got to make that decision?

A: Yes, sir.

Q: And who gets to make that decision?

A: I do.

Q: And so your decision not to testify, Ms. Dodd, is it your decision?

A: Yes, sir.

Q: Do you feel anything improper about it?  Do you feel forced or threatened?  Are you doing this with a clear head?

A: Yes, sir.

A criminal defendant has a constitutional right to testify at trial.  See U.S. Const. Amends. 5, 14; Tenn. Const. Art. I, § 9; Momon, 18 S.W.3d at 157.  This right is fundamental and may only be waived personally, by the defendant. Id. at 161.  In every criminal trial where the defendant does not testify, defense counsel must demonstrate, either by submitting a written waiver or conducting an *in camera* hearing, that the defendant understands that:

>    (1) the defendant has the right not to testify, and if the defendant does not testify, then the jury (or court) may not draw any inferences from the defendant's failure to testify;
>
>    (2) the defendant has the right to testify and that if the defendant wishes to exercise that right, no one can prevent the defendant from testifying;
>
>    (3) the defendant has consulted with his or her counsel in making the decision whether or not to testify;  that the defendant has been advised of the advantages and disadvantages of testifying;  and that the defendant has voluntarily and personally waived the right to testify.

Id. at 162.  The post-conviction court found that trial counsel was not deficient in advising the petitioner about her decision whether to testify.  Because the record supports this finding, we uphold this determination of the post-conviction court.

We now turn to the petitioner's claim that trial counsel was ineffective for refusing to introduce evidence pertaining to the victim's alleged sexual abuse of the petitioner.  At the post-conviction hearing, trial counsel testified that he explained to the petitioner the potential risks and

-12-

rewards of both testifying and refraining from testimony, including the effect that a decision not to testify would have on counsel's ability to introduce such extrinsic evidence of abuse. In response, the petitioner offered only her own contradictory testimony. At various times, she stated both that she would have testified had she understood that Dr. Caruso's testimony was contingent on her own and that she understood that Dr. Caruso would not testify unless she did. On direct examination, the petitioner claimed that she did not testify because counsel told her it was not in her best interest; on cross-examination, she said that the decision not to take the stand was hers alone. The petitioner did not call Dr. Caruso, her mother, her stepbrother, or any other witness to offer testimony that would have been favorable to her defense at trial.

The petitioner argues that her situation is analogous to that of the defendant in State v. Zimmerman, 823 S.W.2d 220 (Tenn. Crim. App. 1991), in which this court found that the failure to present evidence promised during the opening statement, to call witnesses to support the defense's theory of the case, and to call the defendant to take the stand constituted ineffective assistance of counsel. The defendant in Zimmerman was convicted of second degree murder in the stabbing death of her husband. Id. at 221. Her trial counsel's defense theory was that the defendant, suffering from battered women's syndrome, stabbed her husband in self-defense. Id. During his opening statement, trial counsel told the jury that a psychologist would testify to explain the battered women's syndrome defense and that the defendant would testify as well. Id. at 221-22. By the time the State rested, trial counsel had changed his mind; he advised the defendant not to testify, the defense rested without presenting any proof, and the defendant was convicted. Id. at 222. On appeal, the State argued that trial counsel's change in strategy was well-considered because the defendant was a risky witness whose version of events was fraught with inconsistencies. Id. at 226. At a hearing on the defendant's motion for a new trial, trial counsel testified that once he made the decision to advise the defendant not to testify, he did not believe it wise to introduce other testimony:

> This was a case where self-defense was the defense. The defense was not battered wife syndrome. The defense was self-defense. . . . *She was the centerpiece of that defense.* Dr. O'Bryan's testimony and the other witnesses' testimony would only complement hers. And my feeling was that *Dr. O'Bryan's testimony would heighten their desire to hear from Ms. Zimmerman and would have an adverse effect.*

Id. (emphasis in original). This court disagreed, holding:

> Trial counsel has a duty to use witnesses who may be of assistance to the defense. . . . There is a reasonable probability. . . that if the witnesses had been used in accordance with the original plan, the defendant might have been convicted of a lesser offense. In summary, we find no reasonable basis for the defendant to have changed strategy and decided not to call [the psychologist and other favorable witnesses]. . . . The failure to call these witnesses was, we think, indicative of deficient performance by trial counsel.

Id. at 227.

Zimmerman is distinct from the case at bar. The Zimmerman court placed great weight on the fact that trial counsel promised the jury in the opening statement that it would hear from the psychologist and the defendant. This court held that "'[t]he trial attorney should only inform the jury of the evidence that he is sure he can prove. . . . His failure to keep [a] promise [to the jury] impairs his personal credibility. The jury may view unsupported claims as an outright attempt at misrepresentation.'" Zimmerman, 823 S.W.2d at 225 (quoting McCloskey, Criminal Law Desk Book § 1506(3)(O)). Unlike in Zimmerman, there is no evidence here that the petitioner's trial counsel told the jury that the petitioner or Dr. Caruso would testify. The court in Zimmerman was also quite concerned with the sudden and unexplained change in strategy, which appeared arbitrary rather than logical and deliberate. See id. at 226. In contrast, the petitioner's trial counsel's reasoning was constant and unequivocal; if the petitioner refused to testify about the victim's alleged sexual abuse, the testimony of the other witnesses on that subject would be inadmissible. This conclusion was buttressed by the trial court's ruling in limine excluding the testimony of the petitioner's mother and stepbrother on relevance grounds. The petitioner has not explained how the trial court was mistaken in this determination that extrinsic evidence of the alleged sexual abuse was irrelevant if the petitioner had nothing to do with the victim's murder. Finally, the errors of counsel for the defendant in Zimmerman were compounded by a failure to introduce a raft of other relevant, non-testimonial evidence, including "the victim's level of intoxication, the details of [an] assault resulting in [a] protective order, the defendant's 911 call for help after the stabbing, the nature of bruises or abrasions to the defendant, [and] the relative size of the defendant and the victim." Id. There is no indication that the petitioner's trial counsel failed to introduce any similar relevant evidence. These distinctions, taken together, explain why the performance of petitioner's trial counsel "falls within the range of reasonable professional assistance," while the performance of trial counsel in Zimmerman did not.

We agree with the post-conviction court that the petitioner has not met her burden of establishing by clear and convincing evidence that trial counsel was constitutionally ineffective.

> It is elementary that neither a trial judge nor an appellate court can speculate or guess on the question of whether further investigation would have revealed a material witness or what a witness's testimony might have been if introduced by defense counsel. The same is true regarding the failure to call a known witness. In short, if a petitioner is able to establish that defense counsel was deficient in the investigation of the facts or calling a known witness, the petitioner is not entitled to relief from his conviction on this ground unless he can produce a material witness who (a) could have been found by a reasonable investigation and (b) would have testified favorably in support of his defense if called. Otherwise, the petitioner fails to establish the prejudice requirement mandated by Strickland v. Washington.

Black v. State, 794 S.W.2d 752, 757-58 (Tenn. Crim. App. 1990) (footnote omitted). The petitioner called no witness at the post-conviction proceeding whose testimony would have been favorable to her defense at trial, nor did she explain how evidence of the victim's alleged sexual abuse would

have been relevant if the petitioner were not involved in the victim's murder. This court is left to speculate about the nature of the purportedly beneficial testimony. We decline to do so.

Because we find that the petitioner failed to introduce evidence at the post-conviction hearing demonstrating that trial counsel's alleged ineffectiveness prejudiced her defense, our analysis is complete. Courts need not approach the Strickland test in a specific order or even "address both components of the inquiry if the defendant makes an insufficient showing on one." 466 U.S. at 697, 104 S. Ct. at 2069; see also Goad, 938 S.W.2d at 370 ("failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim"). Because the petitioner has not shown prejudice as required by Strickland, we affirm the dismissal of her petition for post-conviction relief without addressing the question of whether trial counsel was deficient.

## **CONCLUSION**

For the foregoing reasons, the judgment of the post-conviction court is affirmed.

_____
ALAN E. GLENN, JUDGE