**STATE of Tennessee, Appellee,**

v.

**Laurie ZIMMERMAN, Appellant.**

Court of Criminal Appeals of Tennessee, at Nashville.

Sept. 24, 1991.

No Application for Permission to Appeal to the Supreme Court.

David L. Raybin, Hollins, Wagster & Yarbrough, P.C., Nashville, Tenn., for appellant.

Charles W. Burson, Atty. Gen. and Reporter, Merrilyn Feirman, Asst. Atty. Gen., Nashville, Guy Dotson, Atty. Gen., Murfreesboro, for State.

## OPINION

WADE, Judge.

The defendant, Laurie Zimmerman, appeals her conviction of second degree murder. She was sentenced to 15 years. The issue presented for review is whether her trial counsel was ineffective.

We find in favor of the defendant, reverse the conviction, and remand the cause for a new trial.

Attorney David Vincent initially represented the defendant. Two days before trial, he associated Herbert Rich as co-counsel. The defense strategy was that the defendant, a battered wife, stabbed her husband in self-defense. The defendant, a clinical psychologist, the defendant's nine and eleven-year-old children, and other witnesses were scheduled to testify on the defendant's behalf. Before the trial began, the state agreed to stipulate that the victim had a blood alcohol content of .11 percent when examined after his death.

During the opening statement, Attorney Rich announced to the jury that the defendant would testify; he stated that a psychologist who had treated the defendant would explain the "battered wife syn-

drome" and testify favorably for the defense. This was in accordance with the strategy mapped out by Attorney Vincent and otherwise met with Vincent's approval. As a part of its proof-in-chief, the state presented portions of a pretrial statement made by the defendant. The victim's brother, a next-door neighbor, two officers, and the emergency room physician also testified for the prosecution. When the state rested, Attorney Vincent, over the private objections of his co-counsel, recommended to the defendant that she not testify. The defendant confirmed her approval of the decision in a jury-out hearing. The defense rested. Neither the psychologist nor the other defense witnesses were called to give testimony. After final argument the jury returned with a verdict of guilt.

## I

The victim, Mark Zimmerman, was 30 years old. He and the defendant had been married for approximately three years and had a two-year-old son, Brian. The defendant had two minor children by a prior marriage. The Zimmermans operated a business from their home called Marketing World, Incorporated, a publication which advertised video. movies.

Just before midnight on Saturday, March 17, 1990, Tony Benton, a neighbor to the victim and the defendant, thought someone was trying to break into his home. When he went to the door, he found the victim wounded and bleeding. Benton directed his wife to call 911, noticed the victim was not breathing, and attempted CPR. Police arrived first, then an ambulance. Within minutes of the stabbing, the victim was transported to the Middle Tennessee Medical Center. An emergency physician attempted resuscitation but was unsuccessful.

Medical evidence established that the knife wound was to the victim's back, just to the left of the spinal cord and below the sternum. The wound was four inches in diameter and extended into the chest cavity. The aorta was severed and the victim bled to death. Death probably occurred within five to eight minutes of the wound.

Officer Randy Garrett of the Murfreesboro Police Department investigated. When he arrived at defendant's residence, he found her upset and crying. She immediately stated, "I stabbed him ... it was an accident." The defendant told the officer that the victim had been drinking and had tape recorded their conversation. Upon further questioning, the defendant related that the victim threatened to take the two-year-old child and leave. She said there was a brief struggle, she somehow wound up with a butcher knife, and stabbed the victim as he reached for their child. She stated that the victim ran out of the residence, apparently removing the knife as he did so. The officer searched the area and found a 12 inch butcher knife in the driveway between the defendant's residence and that of Tony Benton.

The officer found a coat near the open closet door of the master bedroom. Photographs showed blood stains on clothing and the carpet near the Zimmermans' closet, and on the floor and wall near the door of the Benton residence. Another officer detected that the defendant had red marks on her arms, one shoulder, and her lower back. The defendant told that officer that she received the marks in her struggle with the victim prior to the stabbing.

On cross-examination, the first officer testified from his report to portions of the defendant's statements. He acknowledged that the defendant had told him that the victim, prior to the stabbing, took hold of her hand and said, evidently for purposes of the tape recording, "Let me go." On redirect, the officer read from his report of the incident:

Mr. Zimmerman started grabbing her arm, stating "I am tape recording this," talking as he grabbed her saying, "You're accosting me...." Zimmerman shut their two-year-old son, Brian, in a closet in the master bedroom and then asked Laurie where he was. Mr. Zimmerman got the butcher knife from the kitchen, and a brief struggle occurred, with Laurie retrieving the knife. Zimmerman opened the closet door, reaching for Brian, stating "I am going to take

him, you're unfit." Laurie stated she then stabbed Mr. Zimmerman.

Officers recovered the tape recording the victim made of his conversation with the defendant just prior to the stabbing. The day before, the defendant had gone to court to ask for a protective order against the victim. The victim had not appeared to defend and a hearing was scheduled for the following Monday. The victim prefaced the recording with the following statement:

Today's date is March 17, 1990, and I'm using this as my protection against Laurie in the event that she accuses me of any type of verbal abuse or physically abuses me.

The tape recording, which lasted about 27 minutes, was played for the jury. Some of the recorded conversation related to business operations. There was discussion about why the defendant had taken out the protective order. The defendant accused the victim of being an alcoholic, having punched her while she slept at 3:00 A.M. in the morning, and having passed out the same evening on their two-year-old son's bed. At various points, the defendant and the victim called each other liars. The defendant accused the victim of having embezzled money from a prior employer; referred to him as "Mr. Alcoholic"; and stated, in reference to the hearing on the protective order, she had his "ass" and "little dick in a ringer." Both were angry. Voices were raised during much of the taped conversations. The victim accused the defendant of building her "case on lies" and of perpetuating a fraud on the court. He announced that he was getting some clothes and leaving. As the victim walked out the door, the defendant pled with him to talk some more. She repeatedly professed her love for the victim. He refused to talk further. The tape, found by officers in the victim's jacket, ends when the victim walks back into the residence, expressing concern for their son's whereabouts, and the victim's response, "Oh, stop it." From all appearances, the stabbing occurred only minutes after the tape recorder was turned off.

II

The defendant discharged her trial attorneys prior to the motion for new trial. Through her new counsel, she contends that she was ineffectively represented at trial. She argues that her counsel misled the jury by promising a specific defense in the opening statement and then presenting no proof after the state completed its case. She asserts that her trial counsel failed to utilize her witnesses and other available evidence which would have been helpful in her defense; she submits that her trial counsel was ineffective by his recommendation that she not testify.

After a lengthy hearing on the motion for new trial, the trial court found that the defendant made a conscientious decision not to testify based on inconsistencies or inadequacies in her pre-trial statements; there was sufficient investigation; there was no ineffectiveness by the failure to negotiate a plea since the defendant had directed her counsel that she would not accept any offer involving the service of any sentence; reliance upon the discovered material excused any failure on trial counsel's part to interview any state witnesses; the failure to interview defense witnesses did not constitute ineffectiveness; the decision to deviate from the strategy announced in the opening statement was a sound decision; the failure to point out the differences in the size of the victim versus the defendant was not ineffective; the failure to cross-examine the state's witness, Dr. Thrush, who not only treated the victim but also the defendant after a March 8, 1990, incident, was not prejudicial; the failure to place in evidence that the defendant had made a 911 call after the stabbing was not prejudicial; the failure to place certain photographs into evidence was not prejudicial; the failure to get into evidence the stipulation of the victim's blood alcohol was not ineffective assistance; the failure to place into evidence the victim's business records, indicating both drug and alcohol use, was not prejudicial; the failure to call witnesses to testify as to the relationship of the defendant and the victim between 1986 and 1988 was too remote to have been prejudicial; the failure to call other wit-

nesses, including the defendant's children, was not prejudicial; and the failure to present the testimony of the psychologist, who had counseled with the Zimmermans during the marriage, was a reasonable strategy decision.

## III

■ In order to establish that her counsel was ineffective, the defendant must show in the post-conviction proceeding that the advice given or the services rendered were not within the range of competence of attorneys in criminal cases. *Baxter v. Rose*, 523 S.W.2d 930 (Tenn.1975). She must also establish that but for her counsel's deficient performance, the results of the trial would have been different. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

■ The burden is on the petitioner to show that the evidence preponderates against the findings of the trial judge who, in this instance, found in favor of the state. *Clenny v. State*, 576 S.W.2d 12 (Tenn.Crim. App.1978). The findings in the trial court on questions of fact may not be reversed on appeal unless the evidence preponderates otherwise. *Graves v. State*, 512 S.W.2d 603 (Tenn.Crim.App.1973).

In *Strickland*, the standard of review on the issue of assistance of counsel was stated as follows:

First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or ... sentence resulted from a breakdown in the adversary process that renders the result unreliable.

466 U.S. at 687, 104 S.Ct. at 2064.

■ To establish prejudice, the evidence stemming from the failure to prepare a sound defense or present witnesses must be significant, but it does not necessarily follow that the trial would have otherwise resulted in an acquittal. *Id.* at 2071; *see Nealy v. Cabana*, 764 F.2d 1173 (5th Cir. 1985); *Code v. Montgomery*, 799 F.2d 1481 (11th Cir.1986).

In our review of this record, both of the trial and the hearing on the motion for new trial, we have adhered to the clear warnings of *Strickland* "to eliminate the distorting effects of hindsight ... and to evaluate the conduct from counsel's perspective at the time." 466 U.S. at 689, 104 S.Ct. at 2065. We are nonetheless constrained to hold that the efforts of trial counsel were deficient, not necessarily with respect to preparation or investigation, but by the peremptory abandonment of the pre-established and reasonably sound defense strategy—providing for the testimony of the defendant, a psychologist, certain stipulated proof, and supportive witnesses—and the cumulative effect of related errors. At the same time, we must conclude that the evidence presented at the motion for new trial preponderates against the finding of the trial court.

## IV

In this case, there was an indictment for second degree murder. The state presented its proof in an effective, orderly manner and rested at the conclusion of the first day of trial. A case had been made for the offense charged.

The defense strategy was to use the defendant as a witness, to support her testimony with that of the psychologist and other witnesses that she was a physically abused and battered wife under unusual stress at the time of the incident. Documentary evidence had been prepared to establish that the victim was a heavy drinker. The state stipulated that the victim's blood alcohol content was over the presumptive level of intoxication. There were no surprises in the presentation of the state's case. Yet, in spite of the protests of Attorney Rich, the lead counsel at trial, con-

ceding that an acquittal was an impossibility, advised his client to "shut down" the case. The state's stipulation regarding the victim's intoxication was not admitted into proof; upon questioning at the motion for new trial, Attorney Vincent responded, "I forgot."

The first component of the test established in *Strickland* is as follows:

A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. The court must then determine whether, *in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance.* In making that determination, the court should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case.

*Id.,* 466 U.S. at 690, 104 S.Ct. at 2066 (emphasis added).

■ As to the second component, there must be a reasonable probability that but for counsel's unprofessional error, *"the result of the proceeding would have been different,"* not that it necessarily would have been different. 466 U.S. at 693, 104 S.Ct. at 2068 (emphasis added). The probable result need not be an acquittal. A reasonable probability of being found guilty of a lesser charge, or a shorter sentence, satisfies the second prong in *Strickland. Chambers v. Armontrout,* 907 F.2d 825, 832 (8th Cir.1990).

### A. OPENING STATEMENT

■ Rich, with the approval of lead counsel, delivered the opening statement. The defendant was described as a battered and abused woman who had suffered through three years of marriage to the victim. The jury was told that it would "hear from Laurie in this case" and that it would "hear from Dr. Victor O'Bryan, who would explain the battered wife syndrome, would confirm the defendant's efforts to get help for the victim's drinking habits,"

and would assist the jury to understand that the defendant "didn't intend to kill her husband." The theme was repeated throughout the opening statement and the jury was advised that there were other options in addition to second degree murder, such as manslaughter or criminally negligent homicide.

Opening statements are relatively new to the criminal law in this state. As late as 1963, in the case of *Carroll v. State,* 212 Tenn. 464, 370 S.W.2d 523, our Supreme Court held that there could be no opening statement in a criminal case. In the same year, the legislature enacted a statute permitting opening statements in both civil and criminal trials. Tenn.Code Ann. § 20–9–301. Either overstatement or misstatement during this presentation, despite curative efforts, may have adverse effects:

The trial attorney should only inform the jury of the evidence that he is sure he can prove.... His failure to keep [a] promise [to the jury] impairs his personal credibility. The jury may view unsupported claims as an outright attempt at misrepresentation.

McCloskey, *Criminal Law Desk Book,* § 1506(3)(O) (Matthew Bender, 1990).

In *State v. Moorman,* 320 N.C. 387, 358 S.E.2d 502 (1987), the North Carolina Supreme Court found ineffective assistance of counsel based upon the failure to present evidence promised during the opening statement:

A cardinal tenant of successful advocacy is that the advocate be unquestionably credible. If the fact finder loses confidence in the credibility of the advocate, it loses confidence in the credibility of the advocate's cause.

. . . .

The defense's failure to produce any evidence to support the theories proffered at the outset of the trial formed the basis of the closing arguments made by the state in favor of conviction.

*Id.* 358 S.E.2d at 510–511.

We note here that the district attorney general, in closing argument, reminded the jury that the opening statement made on

behalf of the defendant was nothing more than a "smoke screen—they were going to show you that this woman had been abused and battered." The defect was underscored by the final argument made by Mr. Vincent. He referred to facts, obviously intended to be, but never presented to the jury during the course of the trial; the state's objection to any factual reference to the March 8, 1990, protective order was sustained. We also note that Mr. Rich, who vehemently disagreed with the change in strategy, declined to participate in the final argument on the basis that he "couldn't face the jury."

The state concedes that if the decision to abandon its promised course of defense was arbitrary, the defendant was provided ineffective assistance of counsel; but it argues that the plan was based upon well-reasoned logic. That is, that the defendant was a very risky witness and that there were inconsistencies in her explanation of the events. While those assertions may be so, nothing changed during the course of the trial with regard to either the pre-trial statements she had made to officers or the defendant's ability to articulate her defense. In other words, there appears to have been no basis for the sudden change in strategy. Those inconsistencies were just as apparent during the opening statement as they were at the conclusion of the state's proof.

## B. FAILURE TO CALL WITNESSES

Secondly, we hold that if trial counsel's failure to follow through with the promise made in the opening statement had been neither deficient nor prejudicial, the failure to call the defendant's favorable witnesses available would call into question the performance of trial counsel. As to this point, the state makes an innovative if not altogether credible argument that this decision not to call supportive witnesses was a sound trial tactic. By explanation, the defendant, upon advice of her trial counsel, had elected not to testify. Consequently, the rationale not to use the other witnesses is best reflected by a portion of Mr. Vincent's testimony at the hearing on the motion for new trial:

Well, it was my opinion, and in every criminal case, the jury wants to hear from the defendant, regardless of the charge. This was a case where self-defense was the defense. The defense was not battered wife syndrome. The defense was self-defense.... *She was the centerpiece of that defense.* Dr. O'Bryan's testimony and the other witnesses' testimony would only complement hers. And my feeling was that *Dr. O'Bryan's testimony would heighten their desire to hear from Ms. Zimmerman and would have an adverse effect.*

(Emphasis added.)

The logical conclusion of this reasoning, of course, is that in any case where the defendant does not testify, no defense witnesses should be called. The effect here was that no evidence at all, favorable or otherwise, was presented by the defense. Not only did the defendant and her witnesses fail to testify, but matters which the defense should have routinely placed into evidence, such as the victim's level of intoxication, the details of the assault resulting in the protective order, the defendant's 911 call for help after the stabbing, the nature of bruises or abrasions to the defendant, the relative size of the defendant and the victim, as well as other matters, were never placed into evidence.

We conclude that the proof introduced by the defendant at the motion for new trial met the standard for deficient performance:

When a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing. As a general rule, this is the only way the petitioner can establish that (a) a material witness existed and the witness could have been discovered but for counsel's neglect in his investigation of the case, (b) a known witness was not interviewed, (c) the failure to discover or interview a witness inured to his prejudice, or (d) the failure to have a known witness present or call the witness to the stand resulted in the denial of critical

evidence which inured to the prejudice of the petitioner.

*Black v. State,* 794 S.W.2d 752, 757 (Tenn. Crim.App.1980).

Trial counsel has a duty to use witnesses who may be of assistance to the defense. In this instance, those witnesses which could have been produced by the defendant might not have persuaded the jury to acquit. There is a reasonable probability, however, that if the witnesses had been used in accordance with the original plan, the defendant might have been convicted of a lesser offense. In summary, we find no reasonable basis for the defendant to have changed strategy and decided not to call Dr. O'Bryan, neighbors who knew that the victim had assaulted the defendant previously, or the defendant's two older children.

Dr. O'Bryan, for example, had treated the defendant, and to a lesser degree the victim, as early as October 5, 1987. Days before this incident, he treated the defendant for "post-traumatic stress disorder," a form of the battered woman syndrome. The substance of his testimony would have offered mitigating circumstances as to the defendant's culpability. It was Dr. O'Bryan's opinion that the defendant's reaction was due to a sense of "hypervigilance," a characteristic of her stress, and that her reaction "was just sheer survival response."

Further, trial counsel did not cross-examine the emergency room physician about the March 8th incident. Dr. Thrush, who examined the victim after the stabbing and testified to his findings, had also treated the defendant for a cervical strain due to the victim's earlier attempt "to strangle her last night." Obviously, evidence of the earlier incident would have been consistent with the defense.

Although the jury may have rejected Dr. O'Bryan's testimony, the point is that they were never afforded the opportunity to hear from the psychologist. The several other witnesses presented by the defendant during the motion for new trial hearing would have given testimony consistent with the defense theory and, at the very least, provided the jury a reasonable opportunity to consider a lesser degree of homicide. The failure to call these witnesses was, we think, indicative of deficient performance by trial counsel.

## C. FAILURE OF DEFENDANT TO TESTIFY

Finally, the cumulative effect of the misleading opening statement and the failure to present favorable witnesses and other evidence was exacerbated by the trial counsel's recommendation to the defendant not to testify. Trial counsel knew that it was generally important for the defendant to testify. His testimony established that. Moreover, the failure of a defense attorney to call the defendant is often a key factor on the issue of ineffective assistance. In a similar case, this court, in its remand for a new trial, cited factors which would tend to indicate ineffective assistance in that regard:

(1) only the victim and the defendant were present when the offense was committed;

(2) only the defendant could present a "full version of her theory of the facts";

(3) the defendant's testimony could not be impeached by prior criminal convictions;

(4) the defendant could give an account of the relationship with the victim; and

(5) the attorney had let in objectionable, prejudicial testimony with the intention of clarifying it with the testimony of the defendant.

*State v. Gfeller,* No. 87–59–III, 1987 WL 14328 (Tenn.Crim.App., Nashville, July 24, 1987).

The first four factors are applicable here. The announcement of trial counsel that the defendant would testify and explain the circumstances of the stabbing are analogous to the fifth factor. Further, there was other evidence favorable to the defendant that would have come into the record, including the intoxication level of the victim, that did not because of trial counsel's decision to rest the case.

The *Gfeller* case involved an abused female defendant who had been charged with the murder of her husband. Because so many of the circumstances are similar to

those presented here, the case is practically indistinguishable.

Moreover, it is a rare situation indeed where there are not some inconsistencies in the pre-trial statements made by any defendant. For the most part, those made by this defendant were relatively consistent. The only possible inconsistency was in regard to how the stabbing itself occurred. While that was and is clearly a problem for the defense, the pre-established strategy was to confront the issue with the defendant's testimony. We see nothing in the state's proof that would have warranted such a dramatic change in tactics. The testimony of Dr. O'Bryan and others would have helped explain the reactions of the defendant and any possible inaccuracies in her recollection of the events.

Whatever inconsistencies existed were well known to defense counsel prior to the trial. Nothing in this record indicates that an abrupt change of strategy was in order. If it was appropriate for the defendant not to testify, that decision could and should have been made, in this particular situation, at the beginning of the trial.

It may be that none of these three areas of deficient performance, standing alone, would have justified the grant of a new trial. Yet, we think that the cumulative effect of these errors deprived the defendant of a meaningful defense. The reliability of the verdict is in question. We reiterate that these circumstances may not have justified an acquittal; there is considerable evidence indicating guilt of the crime charged. There is, however, a thin line between second degree murder and voluntary manslaughter. Had the defendant's proof been presented to the jury, as planned, there is a reasonable probability that the results would have been more favorable to the defendant.

The judgment is reversed. The matter is remanded for a new trial.

PEAY, J., and JOE D. DUNCAN, Special Judge, concur.