IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs February 20, 2008

## JAMES WAYNE KIMBROUGH v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2001-D-2439     Steve Dozier, Judge**

---

**No. M2007-00612-CCA-R3-PC - Filed October 7, 2008**

---

The petitioner, James Wayne Kimbrough, was convicted of first degree murder (Class A felony) and two counts of spousal rape (Class C felony) on October 17, 2002. He was sentenced to life without possibility of parole for the murder conviction and to fifteen years for the spousal rape conviction, to be served consecutive to the life sentence. On appeal, he argues that the post-conviction court erred in denying him relief. Specifically, he argues that he received ineffective assistance of counsel and that he was denied due process because he was prosecuted with fabricated evidence and perjured testimony. After careful review, we affirm the judgment from the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which NORMA MCGEE OGLE, J., and DAVID G. HAYES, SR. J., joined.

Hershell D. Koger, Pulaski, Tennessee, for the appellant, James Wayne Kimbrough.

Robert E. Cooper, Jr., Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; Victor S. (Torry) Johnson, III, District Attorney General; and Kathy Morante, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

After his conviction, the petitioner appealed, and this court found the relevant facts of this case as follows:

In December 1999, the victim, Jennifer Kimbrough, was working at Kathy's Massage Parlor, which business was a front for prostitution. At that time, the victim was separated from her husband, the [petitioner], whom she had married in February 1999. The [petitioner] had repeatedly expressed his displeasure with the victim's job, frequently calling her a "whore." The [petitioner] had also stated that he was "tired of" the victim's job.

On December 11, 1999, the victim requested that a co-worker, Mary Ann Heidi McMillan, drive her to The Place, a bar and restaurant located at the intersection of Nolensville Pike and Polk Avenue in Nashville. The victim, wearing a black velvet outfit and carrying a duffle bag, makeup bag, and extra clothes, entered The Place alone. After leaving the victim, McMillan drove home.

The Place was owned by Al Pedro, a friend of the [petitioner]. While the victim and the [petitioner] were living together, they had frequented The Place together. When the victim entered The Place on December 11, she began speaking with the [petitioner], who was seated at the end of the bar. The bartender, Ruth Greenfield, and Pedro witnessed the [petitioner] and the victim repeatedly argue and then make up. Greenfield also noticed that the [petitioner]'s right hand was bandaged with gauze and had been for several days. At one point in the evening, Pedro suggested that the [petitioner] buy the victim a drink. The victim stated that she could buy her own drinks because she had her own money. The [petitioner] responded that "she was whoring around, and that's how she got the money."

Between 12:00 and 12:30 a.m. on December 12, 1999, the [petitioner] and the victim left The Place together. The [petitioner] returned to The Place alone between 2:30 and 3:00 a.m. He was no longer wearing the gauze bandage that had been on his hand earlier in the evening. In response to Pedro's inquiry regarding where he had been in the interim, the [petitioner] told Pedro that when he left The Place, he and the victim had sat in his car and talked for a while. Afterward, the [petitioner] went to a Waffle House and to visit his father before returning to The Place.

Thereafter, between 3:00 and 4:00 a.m. on December 12, 1999, Jean Donegan, who lived at 14566 Old Hickory Boulevard in Antioch, woke from her sleep and looked outside her window. She saw something "white" in her driveway, and woke her husband. He advised his wife that it was probably a deer and suggested that she return to bed.

Later that morning, at approximately 6:00 a.m., the Donegan's newspaper carrier, David Williams, arrived to deliver their newspaper. Because of the Donegan's age and the length of their driveway, Williams usually parked his car and walked up the driveway to the house. That morning, when he pulled into the driveway he saw something in the driveway. He initially thought the object was a dead animal. However, when Williams got out of his car and approached the object, he realized that it was a person. He was able to determine that the person was a woman and that she was dead. Williams did not have a cellular telephone; therefore, he ran back to his car, drove to his home and called 911 to report his discovery of the body.

When the police arrived at the Donegan's residence, they found no identification on the body. The victim's body was battered and bloody. Police found tire tracks, a footprint, and three small silver-type beads near the body. In an effort to identify the victim or develop information that would lead to the perpetrator's identity, police spoke with neighbors and began canvassing area motels. Ultimately, Detectives Tim Mason and David Carrell, with the Nashville Metropolitan Police Department (Metro) Murder Squad, determined the victim's identity.

Detectives Mason and Carrell also determined that the [petitioner], who shared the victim's surname, was registered in room 121 at the nearby Knights Inn at the intersection of I-24 and Bell Road in Nashville. During their investigation at the Knights Inn, officers discovered personal items belonging to the victim in a trash can outside room 129. The trash can was located only a short distance from room 121. The items included a black skirt, blouse, and bra; a purse; a necklace; a wallet containing the victim's identification; a makeup bag containing beige makeup and condoms; and pillowcases, towels, and a capped beer bottle all bearing the victim's blood. Also found in the trash can were a gauze bandage which was stained with beige makeup and marked with the [petitioner]'s DNA, a prescription medicine bottle bearing the [petitioner]'s name, and a Coke can with the [petitioner]'s fingerprint. A beer can bearing the victim's fingerprint was found either in the trash or in room 127, a room which was also searched by police in connection with the case.

After discovering the [petitioner]'s name and the victim's belongings in the trash can, a search warrant was obtained for the [petitioner]'s room at Knights Inn. The search of the room yielded few clues. Thereafter, Detective Mason learned that the [petitioner] was at The Place. Detective Mason proceeded to The Place and took the [petitioner] into custody. While in custody, the [petitioner] consented to a search of his car.

During the search of the [petitioner]'s car, officers discovered a small silver bead and a blank notepad. However, they noticed that the pad bore imprints of writing. A technique called "cross-lighting" revealed what had been written on the page preceding the blank page. The indentation revealed the following note:

> I dont's want nothing to do with you. You are a liar. I will be back for my stuff. Leave me alone. Whatever you are doing, keep on. No, I'm not your wife anymore. So f**k you. Don't call me at all. I hate slut puppy you.

Finally, a Luminol test revealed the presence of blood in the [petitioner]'s vehicle.

Dr. Janet Ruth Pillow testified at trial that on December 13, 1999, she conducted an autopsy on the victim. Dr. Pillow stated that when the victim's body was received, there was dried blood on the victim's face, around her pubic area, along her thighs, and around her rectum. Dr. Pillow observed bruising around the victim's eyes and abrasions to her left eye, chin, and neck. Yellow abrasions running parallel to each other extended from the victim's left knee to the top of the left foot. The same yellow abrasion pattern was observed on the right ankle and right foot. The yellow color of the abrasions indicated that the abrasions occurred after the victim's death.

Dr. Pillow said that the victim had blood around and inside her mouth. She found in the front part of the victim's mouth what appeared to be tissue. Additionally, in the farthermost part of the victim's throat, Dr. Pillow discovered a "black object." Upon removal, Dr. Pillow determined that the object was a pair of women's panties. Farther back in the throat, Dr. Pillow found a panty shield. The items were packed "very tightly" in the victim's throat, requiring the use of forceps for removal.

Dr. Pillow described the injuries to the victim's genital area. She related that the opening into the vagina was lacerated and she found blood around and within the vagina. Deeper into the vagina, Dr. Pillow found more extensive lacerations. At the uppermost part of the vagina, adjacent to the cervix, was a laceration measuring four centimeters. The laceration extended through the full thickness of the vagina into the pelvic cavity. Additional multiple small lacerations were also found. Dr. Pillow concluded that these injuries occurred while the victim was alive. Dr. Pillow opined that an unopened capped beer bottle "coming into contact with vaginal tissue would be capable of producing this type of injury."

Upon her examination of the victim's rectum, Dr. Pillow found "many lacerations of varying sizes, all around the anus and even extending as much as four inches into the anal opening, into the lower intestine." The presence of blood and bruising farther into the pelvic cavity indicated that the victim was alive when the injuries were inflicted. Further, Dr. Pillow testified that "[a]s the abdomen was being opened, before it had been completely opened, there was a white, foreign object readily apparent in the abdominal cavity. . . . Then the abdomen was completely opened, and that foreign object was a white, aerosol can." Dr. Pillow stated that the tip of the can had nearly reached the victim's diaphragm.

Dr. Pillow explained that the aerosol can would not have fit through the laceration of the vagina. However, "[t]here was a laceration through the rectum, the lower part of the rectum, four inches inside the rectum from the anal opening." This laceration "went through the full thickness of the wall of the rectum," continuing on "a path of lacerations in the small bowel mesentery." Dr. Pillow further explained

that "[t] he path could be followed from the laceration in the rectum through these lacerations in the mesentery and the hemorrhages, to the point of the aerosol can."

Regarding the cause of the victim's death, Dr. Pillow observed that hemorrhages extended from the top of the neck, in the area of the hyoid bone, the thyroid cartilage, which is a larger cartilage that lies just below the hyoid bone. In fact, the hemorrhage continued to just below the thyroid gland.

From these observations, Dr. Pillow opined that the victim died as a result of manual strangulations by a hand or hands.

Dr. Pillow explained that "victims of strangulation do not actually die from suffocation or having their air cut off; they die from lack of oxygen to the brain." Additionally, Dr. Pillow maintained that death would occur in three to seven minutes during manual strangulation if the pressure on the neck remained constant. However, in cases involving a struggle "survival could be . . . a few minutes longer."

*State v. James Wayne Kimbrough*, M2003-00719-CCA-R3-CD, 2005 Tenn. Crim. App. LEXIS 91 at *1-10 (Tenn. Crim. App. at Nashville, Jan. 31, 2005).

The post-conviction court conducted a hearing on January 4 and 5, 2007. During the post-conviction hearing, the petitioner testified that his convictions were the result of perjured testimony and fabricated evidence. He recalled discussing with counsel that the DNA reports must have been fabricated because he was not connected with the murder of his wife. He said that he was surprised when counsel did not raise the false reports at trial. He testified that the nurses who drew his blood for testing did not take proper precautions in securing the blood. Specifically, he testified that the detective who supervised the procedure placed two vials of blood in his shirt pocket and refused the nurse's offer to seal the vials. The petitioner said he had no recollection of police records establishing a chain of custody for the blood. He theorized that the detective used the blood sample to plant incriminating DNA evidence. He also suggested that the detective planted the can that was found bearing his fingerprints.

The petitioner testified that there had been a conspiracy to convict him and that the evidence logs and autopsy were inaccurate. Specifically, he testified that the autopsy should have indicated the presence of Xanax in the victim's body. He said that she was addicted to Xanax and that it must have been in her blood when she died.

The petitioner acknowledged that, prior to trial, he had all the same documents that he relied on for his post-conviction petition. The petitioner testified that no one took skin from him in order to plant it in the victim's mouth.

Officer Charles Blackwood testified that he collected evidence pertaining to the petitioner's case and described how he processed the materials. He said that he performed a presumptive

presence of blood test on the petitioner's vehicle with Luminol. He testified that the materials he tested indicated that blood was present and that he forwarded the materials to the TBI for further testing.

The defendant had two attorneys at trial. The attorney who sat as second chair counsel testified that she was primarily responsible for research in the petitioner's defense and that she spent 32.7 hours on the DNA issue alone. She testified that her records indicated she spent more than 374 hours working on the defendant's case. She said that they hired two DNA experts and one actually went to the TBI labs and confirmed that the materials had been tested correctly. Counsel's primary expert told her that the State's evidence was strong and did not support the petitioner's claims. She testified that lead counsel was primarily responsible for contact with the petitioner. She said that she met with the petitioner quite a bit. She also said that they never told the petitioner that they agreed that evidence had been fabricated. She said that they did not put on any proof regarding a conspiracy because they were concerned the jury would see the petitioner as delusional and dangerous to society and sentence him to death.

Detective David Carrell testified that he was the lead detective on the petitioner's case. He said that he supervised the collection of the petitioner's blood samples and that they complied with all the proper procedures and maintained a proper chain of custody. He testified that the facts in this case were particularly bad as far as the injuries inflicted upon the victim. He testified that the focus of the investigation was centered on the petitioner as the primary suspect. The petitioner did not provide a confession of any involvement. Detective Carrell said that he did not plant any evidence during this case.

Sergeant Johnny Hunter testified that he took photos of the petitioner during the investigation. He said that he did not falsify any records in the case and that Detective Carrell did not plant any evidence.

Officer William Merryman testified that he was a crime scene investigator for the Metro Police Department. He said that neither he nor Detective Carrell had planted any evidence during the investigation.

Officer Tim Matthews testified that he was a crime scene investigator with the Metro Police Department. He explained why there were two different handwriting styles on the evidence logs. He said that when two officers work a crime scene together, one will document the collected evidence while the other officer collects it. He testified that neither he nor Detective Carrell manipulated evidence in the case to implicate the petitioner.

One of the prosecutors testified that no person involved in the case withheld evidence from the petitioner. She described her process of answering discovery by providing defense counsel with a CD containing all the paperwork and discovery materials.

Dr. Bruce Levy testified that, at the time of the petitioner's trial, the toxicology lab kept liquid samples for only a six-month period. He said that Xanax would not have remained in the victim's system for a very long time.

A forensic scientist for the TBI testified that he properly logged any movement of evidence that he examined. He said that DNA analysis of skin found in the victim's throat was consistent with that of the petitioner and the victim. He said that none of the evidence was tampered with, mixed, or tainted.

The petitioner's lead trial counsel testified that he had handled between seventy-five and one hundred murder cases, as well as four or five death penalty cases. He said he stopped counting the hours he spent on the petitioner's case when he reached 300 hours. He met with the defendant thirty-three times. He said he was aware of the petitioner's "conspiracy theory" and recalled that the petitioner kept an "X file" that he asserted would exonerate him. He said the petitioner never shared the information with him.

Counsel testified that he found no indication that any evidence had been planted. He said his focus was to point out what he believed was a "sloppy investigation." Counsel testified that he did tell the petitioner that things were going well during the trial because he was afraid the petitioner would have an outburst during the trial if he felt things were going poorly. He believed the outcome of the trial was favorable because the petitioner did not receive the death penalty.

Analysis

On appeal, the petitioner argues that the post-conviction court erred in failing to find that he received ineffective assistance of counsel. Specifically, he argues that there were numerous questionable documents involving the handling and resubmitting of evidence and that his counsel was aware of the evidentiary issues and failed to expose the problems with the evidence presented. He also argues that counsel intentionally misled him with regard to the defense they would put on at trial because he contends that counsel agreed with him that the evidence was fabricated. The State argues that the petitioner should have raised the evidentiary issues on direct appeal and that his failure to raise these issues constitutes a waiver because the issue is not appropriate for post-conviction relief.

In order to receive post-conviction relief based on a claim of ineffective assistance of counsel, a petitioner must demonstrate the existence of two factors: 1) trial counsel's performance was deficient; and 2) the deficient performance prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Failure to satisfy both prongs of the test results in a denial of relief to the petitioner. We review the post-conviction court's factual findings underlying a claim of ineffective assistance of counsel under a *de novo* standard with a presumption that those findings are correct – unless the preponderance of the evidence establishes otherwise. *State v. Burns*, 6 S.W.3d 453, 463 (Tenn. 1999). The court's application of the law to the facts, however, faces a *de novo* standard of

review without any presumption of correctness. *Id.* To secure relief, a petitioner must prove the allegations contained in his petition by clear and convincing evidence. T.C.A. § 40-30-110(f).

In order to satisfy the first prong of the test, a petitioner must show that counsel's errors were "so serious that counsel was not functioning as the 'counsel' guaranteed the petitioner by the Sixth Amendment." *Strickland v. Washington,* 466 U.S. at 687. To do this, a petitioner must establish that trial counsel's "acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). When reviewing trial counsel's performance, the petitioner is not entitled to the benefit of hindsight, and the role of the court is not to second-guess the strategy and tactics decided upon by counsel. *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982).

The second part of the test requires the petitioner be able to prove that a reasonable probability exists that, but for counsel's unprofessional errors, the results of the proceeding would have been different. *Strickland*, 466 U.S. at 694. However, the petitioner does not have to prove that the probable result would have been acquittal. *State v. Zimmerman*, 823 S.W.2d 220, 224 (Tenn. Crim. App. 1991). The probability of a lesser conviction or shorter sentence will suffice. *Id.*

Here, the petitioner's allegations revolve around a conspiracy theory that the police fabricated and planted evidence against him. The petitioner did not present any proof of the alleged conspiracy other than his own testimony. All of the police officers testified that they were not involved in fabricating or planting evidence against the petitioner, and his trial counsel testified that they discovered no evidence of such a conspiracy. Further, counsel testified that they did not pursue a defense of a conspiracy theory because they thought the petitioner would look delusional and dangerous to the jury, a situation they did not want in a death penalty case.

Witnesses who testified during the post-conviction hearing also provided rebuttal testimony to many of the petitioner's theories. The post-conviction court issued a detailed order denying the petition and found the testimony of the petitioner not credible. The petitioner has not demonstrated on appeal that the post-conviction court erred in determining that counsel was ineffective or that their representation of the petitioner resulted in prejudice in his defense.

Conclusion

Based on the foregoing and the record as a whole, we affirm the judgment from the post-conviction court.

_____
JOHN EVERETT WILLIAMS, JUDGE

-8-