IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
September 5, 2018 Session

**ANTONIO OLIVER v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Shelby County**
**No. 04-08346      Paula L. Skahan, Judge**

**No. W2017-01472-CCA-R3-PC**

The Petitioner, Antonio Oliver, appeals the Shelby County Criminal Court's denial of his petition for post-conviction relief from his first degree murder conviction, for which he is serving a life sentence. The Petitioner contends that he received the ineffective assistance of trial counsel. We affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL and NORMA MCGEE OGLE, JJ., joined.

William D. Massey (on appeal and at hearing) and Melody M. Dougherty (on appeal), Memphis, Tennessee, for the appellant, Antonio Oliver.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Senior Counsel; Amy P. Weirich, District Attorney General; and Pamela Stark and Charles Summers, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

This case arises from the 2004 homicide of Michelle Lynn Ratliff Berry. *See State v. Antonio Oliver*, No. W2006-01736-CCA-R3-CD, 2007 WL 3194570 (Tenn. Crim. App. Oct. 30, 2007), *perm. app. denied* (Tenn. Feb. 15, 2012). The Petitioner was convicted of first degree murder and received a life sentence. The Petitioner appealed, and this court summarized the facts as follows:

> At the trial, Sterling Ratliff testified that the victim, Michelle Lynn Ratliff Berry, was his daughter. He said she was twenty-seven years old at the time of her death and had a son and a daughter. He said that the victim

told him she was "dancing in a nightclub" in Memphis but that he was unaware of her living arrangements.

Rachel Molica testified that the defendant had been her pimp and was the father of her child. She said she met him after she ran away from home. She said that at the time she met the defendant, she was working as a prostitute on the streets and that she was using rock and powder cocaine. She said she danced and prostituted herself and that he received the profits. She identified the victim as another woman who had worked for the defendant. She said that she and the victim lived with the defendant in various locations. She said she had lived with the defendant for about three years and the victim had lived with them for about two of those years. She said that a third woman, Carol Hendricks, had lived with them for the last three months of the arrangement and that other women had come and gone. She said there were rules the defendant required them to follow. She said that they brought their money home and gave it to him and that they would ask the defendant if they needed money for clothes or groceries. She said they were not allowed to keep any money for themselves. She said that they were not allowed to talk to other black men and that they could only prostitute themselves to white men. She said the defendant had to know where they were at all times. She said that if they broke a rule, the defendant would become physically violent. She said they were provided with nice clothing, jewelry, and cars.

Ms. Molica testified that in September 2004, she was living with the defendant, the victim, Carol Hendricks, the victim's daughter, and Ms. Molica's daughter. She said that on a Sunday night in September, the children were with a babysitter and that the adults went for a ride around 7:30 p.m. She said everyone was smoking "weed." She said the women usually worked on Sundays, although the defendant had told them they did not have to work that night. She said that they returned to their house and that the defendant told the victim to come into the house. She said that she and Hendricks remained in the truck and that after a few minutes, they could see from shadows inside the house that the defendant had the victim on the ground and was hitting and kicking her. She said that after about ten minutes, the defendant came outside and told them to come into the house. She said she was terrified because she did not know whether she and Hendricks were going to be beaten as well. She said that they went inside and sat on the couch and that the defendant locked the door and continued his assault on the victim. She said that the defendant beat the victim for about four hours. She said that the defendant knocked the victim to the ground repeatedly, kicked her, punched her, pulled her hair, and demanded to know what secret she was keeping from him. She said that the defendant beat the victim with a boot, stomped her, stood on her, picked her up and threw her

-2-

into a television, hit her with his belt, hit her with a child's chair, and beat her with a wooden cane. She said that during this assault, the defendant extracted information from the victim about an ex-boyfriend with whom the victim had been in touch. She said that about halfway through the assault, the defendant called the ex-boyfriend after learning his name and telephone number from the victim and that the victim was able to pick herself up, speak, and sit on the couch. She said that the defendant learned during the conversation with the victim's ex-boyfriend that the victim had driven the defendant's car to visit the ex-boyfriend and that this enraged the defendant even more.

Ms. Molica testified that after the telephone call, the defendant became more violent and said the victim had not told him the whole story. She said the defendant began beating the victim with his cane. She said the victim told the defendant he was going to kill her, to which the defendant responded, "[D]ie, b——, die." She said the defendant told the victim repeatedly that she "was going to leave in an ambulance or by the morgue." She said the victim was trying to protect her body from the defendant's blows and asked the defendant to stop. She said that at one point, she had helped the victim to her room and that the victim could not hold up her chest. She said she told Hendricks that something was not right because "[the victim's] eyes were fully dilated and you would look at her but there was no one there." She said the defendant resumed the beating and dragged the victim down the hallway and made her come back into the front room. She said that just before the defendant hit the victim on her head with his cane, the victim said, "God, save me," and the defendant responded, "[Y]our god can't save you."

Ms. Molica testified that during the course of the beating, the defendant took breaks. She said that he became winded and that he removed clothing. When asked why she did not call the police, Ms. Molica explained, "Unfortunately, this wasn't anything new to me." She said that doing so would have been "a violation" and that she did not know the victim was going to die. She said that "[u]sually when [the victim] gets beat up and is hurting, the next day [the defendant] will let me take her to a local ER room."

Ms. Molica said that she and Hendricks left the house at about 1:30 a.m. because they had to pick up the children from the defendant's mother, who was babysitting, and the defendant had told them to go to the grocery store. She said that when they left, the victim was on one of the couches, and that the victim was still there when they returned. She said that she and Hendricks prepared tacos for the defendant and that he slept on another couch near the victim.

Ms. Molica testified that about 10:30 the next morning, she heard the defendant yelling at the victim to get up. She said that the defendant called for her and that she went into the front room. She said the victim was lying on the couch with her eyes open. She said the victim's tongue was white and crusty. She said the victim's breaths were shallow and then stopped within ten seconds. She said that Hendricks had come into the room and that she, Hendricks, and the defendant attempted to stand the victim up but that the victim "was dead weight." She said the defendant became frantic and that they hid a towel the defendant had used to wipe his sweat, the defendant's cane, and the defendant's belt. She said that the defendant told her to call an ambulance, which she did, and that the defendant left. She said she attempted CPR but that "her blood came back up." She said the defendant called her after he left the house to find out what was happening. She said the defendant told her to say that the victim's ex-boyfriend had done this to her and that they had picked up the victim at midnight at Wal–Mart.

Ms. Molica testified that she had lied to the police at first and blamed the victim's ex-boyfriend for the attack but that she eventually told the truth. She said that she was scared and did not want the defendant to be mad at her but that she could not live with trying to "cover up." She said she did not remember whether she had said at the defendant's preliminary hearing that she became truthful only after the police threatened to charge her with a crime.

Ms. Molica identified photographs of the deceased victim on the living room floor. The photographs depicted the victim's injuries, including bruises, abrasions, cuts, and bleeding. She attributed all of the injuries depicted in the photographs to the defendant.

Lieutenant Mark Miller of the Memphis Police Department testified that he was involved in the investigation of the victim's death. He identified a towel that he took from the police department's property room to the Tennessee Bureau of Investigation.

Rickey Davison of the Memphis Police Department testified that he was involved in crime scene investigation of the victim's death and that he photographed the crime scene. He identified photographs of a pink plastic chair that was in the "den area," a towel that was on top of a washing machine in the kitchen, a belt on top of some clothing in a bedroom, and a wooden walking cane. He also identified the chair, cane, and towel as exhibits.

Sergeant Paula Harris of the Memphis Police Department testified that she obtained DNA samples from the defendant. She said that after first storing the samples in the property room, she transmitted the samples to the TBI for testing.

Qadriyyah Debnam, Ph.D, testified that she was employed as a special agent forensic scientist of the serology DNA unit of the TBI Memphis Crime Laboratory. She testified as an expert witness in serology and DNA analysis. She said she analyzed the towel and determined that it contained DNA from both the defendant and the victim. She admitted that DNA could remain on a towel for an "indefinite" period of time and that nothing indicated whether the DNA on the towel had been placed there in September 2004. She said the defendant's and the victim's DNA on the towel were from blood.

Doctor Joye Carter testified as an expert in forensic pathology. She examined the victim's body and determined that numerous injuries were all over the body, including bruises, lacerations, and contusions. She also noted bleeding from the nose, broken ribs, a large laceration of the liver, a lacerated gall bladder, and bleeding inside the brain. She stated that the victim's cause of death was multiple blunt force injuries and that the manner of death was homicide. She said she examined a plastic chair and a wooden cane and that some of the patterns on the objects could be consistent with marks on the victim's body. She said that the cane's handle was broken where it fit into the staff and that she saw what appeared to be blood on it, although she acknowledged a report indicating that a presumptive test performed by the TBI failed to indicate the presence of blood. She said what appeared to be blood was also on the chair. She said a TBI report stated that blood and the victim's DNA were on the chair. She identified photographs of the victim's injuries.

Doctor Carter testified that the examination of the victim's body took place on September 20 and 21, 2004. She said some of the victim's injuries would have become more pronounced with the passage of time. She stated that the injuries appeared to have been inflicted within twenty-four hours of when she began her external examination on September 20.

Doctor Carter said the victim did not have alcohol, marijuana, or other illicit drugs in her system. She did have in her system promethazine, which is a pain medication, and codeine, which is used for pain and coughing.

*Id.* at *1-4. This court affirmed the trial court's judgment. *Id.* at *1.

The Petitioner filed a pro se petition for post-conviction relief on March 12, 2009, after the one-year statute of limitations had expired. In his initial petition, the Petitioner raised multiple claims of ineffective assistance of trial counsel and appellate counsel, including appellate counsel's failure to file an application for permission to appeal to our supreme court. The Petitioner requested equitable tolling of the statute of limitations.

A post-conviction hearing was held to determine whether the post-conviction court would grant the Petitioner's motion to toll the statute of limitations. The Petitioner was represented by his first post-conviction counsel at the hearing. The post-conviction court denied the Petitioner's motion to toll the statute of limitations and dismissed the post-conviction petition. The Petitioner appealed, and this court reversed the post-conviction court's judgment after determining that due process required tolling of the statute of limitations, and it stayed the post-conviction court proceedings in order for the Petitioner to file an application for permission to appeal to the supreme court. *See Antonio Oliver v. State*, No. W2009-02113-CCA-R3-PC, 2011 WL 4432884, at *6 (Tenn. Crim. App. Sep. 23, 2011); *see also* T.R.A.P. 11. First post-conviction counsel filed the application, which our supreme court denied. *See State v. Antonio Oliver*, No. 2006-01736-SC-R11-CD (Tenn. Feb. 15, 2012) (order).

Next, the Petitioner's second post-conviction counsel filed an amended post-conviction petition. In the petition, the Petitioner claimed he received the ineffective assistance of trial counsel but waived his ineffective assistance of counsel claims relative to appellate counsel, who also served as second post-conviction counsel, regarding the appeal of his conviction.[1] Although the amended petition for post-conviction relief alleged multiple claims of ineffective assistance by trial counsel, the Petitioner's only claim on appeal is that trial counsel was ineffective for not calling him to testify at the trial.

At the post-conviction hearing, the Petitioner testified that he and trial counsel spoke about hiring an expert witness, that he gave counsel the funds to hire an expert, and that counsel never hired an expert because "[t]here wasn't one." The Petitioner said that post-conviction counsel had an independent expert review his case and that the expert could not dispute the medical examiner's determined cause of death.

The Petitioner testified that trial counsel visited him at the jail three times before the trial, that counsel spoke with him a few times before court hearings, and that he reviewed discovery with counsel. The Petitioner said that he told counsel the victim was taking medication for a tumor at the time of her death, that counsel said if he could prove the victim was being medicated for a tumor, the case would be a reckless homicide, and that counsel said it was "not a first degree murder, because [the victim] died the next day."

---

[1] We note that the Petitioner was represented by trial counsel and co-counsel at the trial and that the Petitioner only claims that trial counsel provided ineffective assistance.

The Petitioner testified that he did not know what Ms. Molica's testimony would show and that he did not recall discussing her testimony with trial counsel. The Petitioner said that the State extended a plea offer of twenty years' incarceration, that he thought a twenty-year sentence was excessive, and that he rejected the offer because he did not intend to kill the victim. The Petitioner said that counsel told him of the dangers of going to trial and that he did not understand the process. The Petitioner stated that his defense at the trial was that he did not commit premeditated murder, that he did not know the victim was going to die, and that counsel spoke with him three or four times about evidence he could use to argue the Petitioner was guilty of a lesser included offense.

The Petitioner testified that the jury was composed of only one man, that he did not feel comfortable with the jury's composition, and that he trusted trial counsel. The Petitioner said that no witnesses testified for the defense at the trial and that he and counsel discussed whether he should testify after the State rested its case. The Petitioner said that counsel advised him that testifying was not in the Petitioner's best interests and that the Petitioner agreed. The Petitioner stated that he knew the decision to testify belonged to him, that he relied on counsel's advice, and that counsel said he "wasn't going to put me on the stand" when he visited the Petitioner before the trial. The Petitioner said that he and counsel discussed his testifying at the trial a couple of times. When asked whether he and counsel discussed that the jury would not hear another explanation unless the Petitioner testified, the Petitioner responded, "I think so," and said he did not recall whether that factored into his decision of whether to testify.

The Petitioner testified that the prosecutor made "inappropriate remarks" to the jury during jury selection, opening statements, and closing arguments and that the remarks were an appeal to the female jurors to protect the victim. The Petitioner stated that the remarks were raised on direct appeal and that this court conducted a plain error review because counsel did not object at the trial. The Petitioner said this court concluded that he was not entitled to relief and that counsel erred by not objecting.

The Petitioner testified that he did not have a clear understanding of his defense at the trial, that he and trial counsel did not discuss how counsel was going to present his "lifestyle" to the jury, and that the twenty-year offer was excessive. The Petitioner stated that he told counsel he would plead guilty to either manslaughter or reckless homicide, that counsel never relayed a second plea offer to him, and that had he known the State's only offer was going to be for a twenty-year sentence, he might have accepted the initial offer. The Petitioner stated that he felt counsel incorrectly advised him, that he did not have an opportunity to plead guilty to a lesser charge, that he did not have an opportunity to testify at the trial, and that counsel should have objected to the jury composition.

On cross-examination, the Petitioner testified that he did not dispute the facts of the case, that two other witnesses were present when he beat the victim, and that he did not try to kill her. The Petitioner stated that he beat the victim with his hands, that he did not beat

-7-

her with a cane, and that he did not constantly beat the victim for hours. The Petitioner said that he did not say, "Die b----, die," and that he would have told the jury the truth if he had the opportunity to testify. The Petitioner stated that trial counsel advised him not to testify, that he followed counsel's advice, and that he understood whether to testify was his decision. The Petitioner said that he should have been convicted of manslaughter or reckless homicide and that counsel "told [him] that's what it was." The Petitioner said that the jury should have been composed of equal numbers of men and women. The Petitioner acknowledged that the defense had no favorable trial witnesses.

Trial counsel testified that he did not "think he advised [the Petitioner] not to testify" and that he and the Petitioner discussed at length whether the Petitioner should testify. Counsel stated that he did not recall the conversation with the Petitioner relative to testifying and that his practice was to advise his clients of their right to testify and explain it was their decision. Counsel acknowledged that Ms. Molica testified that the Petitioner said, "Die b----, die" and "Your God can't save you," when beating the victim. Counsel agreed the statements might have led the jury to conclude that the Petitioner intended to kill the victim. Counsel said that he argued the Petitioner committed reckless homicide, as opposed to an intentional killing, that he did not know the weight the jury would have given to the Petitioner's testimony, and that he did not know what effect the Petitioner's testimony would have had on the jury. Counsel stated that he could only tell the Petitioner of his right to testify and that it was the Petitioner's decision. Counsel stated that because of the evidence, he did not know whether the Petitioner's testifying would have helped the Petitioner's case.

Trial counsel testified that he did not recall discussing the State's potential evidence with the Petitioner. Counsel acknowledged that Ms. Molica testified that the Petitioner's beating the victim was not "anything new" and stated that he did not object, request a curative instruction, or make a motion for a mistrial. Counsel testified that he did not recall whether he interviewed Ms. Molica before the trial and whether he hired an investigator. Counsel said that he did not recall discussing the discovery with the Petitioner but that it was his practice to discuss the discovery with every client. Counsel stated that he did not object during the State's closing argument because he did not believe the objection would have made a difference in the outcome and that the Petitioner was convicted based on the facts. Counsel said that he did not recall how many times he met with the Petitioner before the trial and that he thought the Petitioner's testimony that they met three times was inaccurate.

On cross-examination, trial counsel testified that he had been practicing law since 1974 and that he had represented multiple clients accused of murder. Counsel agreed that the facts were "pretty egregious" and said that it was a difficult case. Counsel said that he and the Petitioner discussed trial strategy and the physical evidence and that he cross-examined the State's witnesses relative to their lifestyles. Counsel stated that he made a

motion for judgment of acquittal and argued that the Petitioner did not intend to kill the victim.

Counsel testified that evidence showed the victim was beaten for an extended period of time, that he did not know what benefit the Petitioner's testimony would have provided the defense, and that it would have been "devastating" had he testified. Counsel stated that he spoke with the Petitioner during the trial relative to testifying. Counsel said that he tried to make it clear to the Petitioner that he had a right to testify and that he conducted a voir dire of the Petitioner on the record. A transcript of the trial was introduced as an exhibit, and counsel was asked to review his voir dire of the Petitioner. After counsel reviewed the transcript, he stated that he had advised the Petitioner not to testify, that he did not recall advising the Petitioner against testifying, and that he understood why he would have advised the Petitioner not to testify.

Counsel testified that the Petitioner stated during the voir dire that he participated in his defense and that he understood he had the right to testify. Counsel said that the trial court discussed testifying with the Petitioner, that the trial court explained to the Petitioner he had a right to testify, and that the Petitioner told the court he had decided not to testify. Counsel stated that he did not recall the State making inappropriate remarks during jury selection, that he did not object to Ms. Molica's testifying that the Petitioner's beating the victim was not "anything new," and that from a trial strategy perspective, he had to be careful about objecting in front of the jury.

The post-conviction court entered a written order denying post-conviction relief. The court concluded that the record did not support the Petitioner's claim that trial counsel "deprived him of the right to make an intelligent and informed decision as to whether he should have testified." The court found that the testimony of the Petitioner and counsel reflected that the Petitioner understood that testifying at the trial was his only opportunity to dispute the State's case and that he would be subject to cross-examination. The court found that the Petitioner's decision not to testify was intelligent and informed, that his decision did not prejudice the outcome of the case, and that the State's evidence proved beyond a reasonable doubt that the Petitioner beat the victim to her death for several hours. The court determined that the Petitioner failed to show that counsel provided deficient performance resulting in prejudice. This appeal followed.

The Petitioner contends that the post-conviction court erred in denying relief on his claim that he received the ineffective assistance of trial counsel because counsel did not call him to testify at the trial. The State responds that the court properly denied relief. We agree with the State.

Post-conviction relief is available "when the conviction or sentence is void or voidable because of the abridgement of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103 (2012). A

petitioner has the burden of proving his factual allegations by clear and convincing evidence. *Id.* § 40-30-110(f) (2012). A post-conviction court's findings of fact are binding on appeal, and this court must defer to them "unless the evidence in the record preponderates against those findings." *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997); *see Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). A post-conviction court's application of law to its factual findings is subject to a de novo standard of review without a presumption of correctness. *Fields*, 40 S.W.3d at 457-58.

To establish a post-conviction claim of the ineffective assistance of counsel in violation of the Sixth Amendment, a petitioner has the burden of proving that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see Lockhart v. Fretwell*, 506 U.S. 364, 368-72 (1993). The Tennessee Supreme Court has applied the *Strickland* standard to an accused's right to counsel under article I, section 9 of the Tennessee Constitution. *See State v. Melson*, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

A petitioner must satisfy both prongs of the *Strickland* test in order to prevail in an ineffective assistance of counsel claim. *Henley*, 960 S.W.2d at 580. "[F]ailure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim." *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). To establish the performance prong, a petitioner must show that "the advice given, or the services rendered . . . , are [not] within the range of competence demanded of attorneys in criminal cases." *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975); *see Strickland*, 466 U.S. at 690. The post-conviction court must determine if these acts or omissions, viewed in light of all of the circumstances, fell "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. A petitioner "is not entitled to the benefit of hindsight, may not second-guess a reasonably based trial strategy by his counsel, and cannot criticize a sound, but unsuccessful, tactical decision." *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994); *see Pylant v. State*, 263 S.W.3d 854, 874 (Tenn. 2008). This deference, however, only applies "if the choices are informed . . . based upon adequate preparation." *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). To establish the prejudice prong, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

The record supports the post-conviction court's determination that the Petitioner failed to prove that trial counsel was deficient for not calling the Petitioner as a trial witness. The Petitioner testified that he and counsel discussed whether he would testify and that the Petitioner understood it was his decision. When asked whether he and counsel discussed that the jury would not hear another explanation for the victim's death if the Petitioner did not testify, the Petitioner responded "I think so." The Petitioner stated that although he did not dispute the facts of the case, including his beating the victim, he did not

intend to kill the victim. Counsel testified that although he did not recall the conversations with the Petitioner, counsel's practice was to inform his client of the right to testify and to explain that whether to testify was the client's decision. Counsel stated that he and the Petitioner had extensive discussions relative to the Petitioner's testifying and that the Petitioner's testimony would have been "devastating" to the defense. Counsel stated that he conducted a voir dire of the Petitioner relative to his right to testify at the trial and that the Petitioner said he understood he had the right to testify. Counsel said the trial court conducted a hearing pursuant to *Momon v. State*, 18 S.W.3d 152 (Tenn. 1999), in which the Petitioner was advised of his rights relative to testifying and in which the Petitioner stated he had elected not to testify. The record does not preponderate against the post-conviction court's determination that counsel's representation was not deficient.

In reaching this conclusion, we have not overlooked the Petitioner's reliance on *State v. Zimmerman*, 823 S.W.2d 220 (Tenn. Crim. App. 1991), to support his claim. In *Zimmerman*, the defendant was convicted by a jury of second degree murder, and the defense theory was that the defendant was a battered wife who stabbed her husband in self-defense. *Id*. at 221. During opening statements, defense counsel told the jury that the defendant would testify but advised the defendant not to testify after the State's case in chief. On appeal, the defendant argued that defense counsel was ineffective for not calling her to testify. This court applied the following five factors to determine whether defense counsel was deficient:

> (1) only the victim and the defendant were present when the offense was committed;
>
> (2) only the defendant could present a "full version of her theory of facts";
>
> (3) the defendant's testimony could not be impeached by prior criminal convictions;
>
> (4) the defendant could give an account of the relationship with the victim; and
>
> (5) the attorney had let in objectionable, prejudicial testimony with the intention of clarifying it with the testimony of the defendant.

*Id*. at 227 (quoting *State v. Dorothy Renate Gfeller*, No. 87-59-III, 1987 WL 14328 (Tenn. Crim. App. July 24, 1987)). This court considered that defense counsel told the jury the defendant would testify, that other evidence favorable to the defendant would have been introduced, and that nothing in the State's case warranted a change in defense counsel's strategy. *Id*. at 227-28. This court determined that defense counsel was deficient and that had the defendant testified, "there [was] a reasonable probability that the results would have been more favorable to the defendant." *Id*. at 228.

However, this case is distinguishable from *Zimmerman* because no evidence shows that trial counsel told the jury that the Petitioner would testify, the record does not indicate that a sudden change in trial strategy occurred, and the Petitioner stated at the post-conviction hearing that there were no favorable defense witnesses. Therefore, we conclude that it is unnecessary to review the factors listed in *Zimmerman*. We also note that the Defendant was informed of his right to testify by the trial court and that the Defendant personally waived his right to testify on the record. *Momon*, 18 S.W.3d at 163. The Petitioner failed to establish his ineffective assistance of counsel claim and is not entitled to relief on this basis.

In consideration of the foregoing and the record as a whole, we affirm the judgment of the post-conviction court.

_____
ROBERT H. MONTGOMERY, JR., JUDGE