

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
November 8, 2016 Session

**DEANGELO MOODY v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Davidson County**
**No. 2009-D-3252      Mark J. Fishburn, Judge**

———————

**No. M2015-02424-CCA-R3-PC**

———————

The State appeals the trial court's granting the petitioner, Deangelo Moody, post-conviction relief from his conviction for first degree felony murder after finding that the petitioner received ineffective assistance of counsel.  After review, we reverse the post-conviction court's grant of relief and reinstate the judgment against the petitioner.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Reversed**

ALAN E. GLENN, J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and ROBERT W. WEDEMEYER, J., joined.

Herbert H. Slatery III, Attorney General and Reporter; Leslie E. Price, Senior Counsel; Glenn R. Funk, District Attorney General; and Brian Ewald, Assistant District Attorney General, for the appellant, State of Tennessee.

Dustin E. Sharp, Knoxville, Tennessee, for the appellee, Deangelo Moody.

**OPINION**

**FACTS**

A Davidson County grand jury indicted the petitioner and two co-defendants, Martez D. Matthews and Lorenzo Ortago Thomas, II, for first degree felony murder committed during the attempt to perpetrate a first degree murder and employing a firearm during the commission of a dangerous felony.  Mr. Thomas' case was severed, and he pled guilty to a lesser charge.  After a trial, the jury convicted the petitioner and Mr. Matthews of first degree felony murder and imposed life sentences.  The jury acquitted the petitioner of the employment of a firearm charge.

The petitioner and Mr. Matthews filed a joint appeal. State v. Deangelo M. Moody and Martez D. Matthews, No. M2011-01930-CCA-R3-CD, 2013 WL 1932718 (Tenn. Crim. App. May 9, 2013), perm. app. denied (Tenn. Oct. 17, 2013). This court affirmed the judgments of the trial court, and the Tennessee Supreme Court denied both applications for permission to appeal. Id.

The underlying facts of the case were recited by this court on direct appeal as follows:

This case involves the shooting death of the victim, a sixteen-year old female, L.J.[1] During a shoot-out that occurred on the street outside her home, the victim was struck by a stray bullet when it entered her home. A Davidson County grand jury indicted appellants and their co-defendant, Lorenzo Ort[a]go Thomas, II, for one count of first degree felony murder and one count of employing a firearm during the commission of a dangerous felony. Codefendant Thomas'[] case was severed from appellants' case, and the trial court conducted their joint trial from May 9-12, 2011.

Inez Johnson, the victim's mother, testified that around 4:00 p.m. on April 25, 2009, she and the victim were at their home on Chesapeak[2] Drive. They were lying down in Ms. Johnson's bedroom when they heard gunshots. Ms. Johnson stated that she "instinctively . . . dropped and rolled." She further stated that "instead of laying low and rolling from the bed, [the victim] raised her body up" and was struck by a bullet. The victim began bleeding from her mouth. Ms. Johnson called 9-1-1 and rendered aid to the victim in an attempt to stop the bleeding. She said that she could not tell from where the victim was bleeding. She recalled, "[B]lood was just everywhere, . . . and I was right there beside her[,] and I knew [she] wasn't going to make it[,] and I watched her take her last breath. . . ."

Christopher Cote, a detective with the Metro Nashville Police Department ("MNPD"), testified that around 4:00 p.m. on April 25, 2009, he responded to a call at 3652 Chesapeak Drive. The paramedics were already at the scene when he arrived. Officer Cote was advised that a

---

[1] We have used the initials of the minor victim of this crime to protect her identity.

[2] The transcript spells the street name as "Chesapeake." However, the street sign shown in one of the crime scene photographs spells the name "Chesapeak."

sixteen-year-old female had been shot. He entered the home and observed the victim lying on the floor, bleeding profusely. The paramedics transported the victim to the hospital, and additional police officers arrived at the scene. Officer Cote stated that he secured the scene and advised his superior officers and investigators as to what had occurred.

Officer Cote recalled that Officer Brian Eaves arrived at the scene. He stated that a witness approached Officer Eaves and gave him a hat that the witness had found. He placed the hat, which the witness found in the street to the right of the victim's house, in an evidence bag and gave it to the crime scene investigators. Officer Cote stated that he also found multiple shell casings of different calibers at the scene.

Lynne Mace, a crime scene investigator with the MNPD, testified that she investigated the scene in this case. She drew a diagram of the scene, which she described for the jury. The diagram depicted the locations of bullet cartridge casings. Investigator Mace also photographed and collected the cartridge casings. Investigator Mace recalled that there were two .45 caliber automatic casings and six 9mm casings. She identified photographs that she had taken of the crime scene, including a photograph of the strike mark of the bullet that entered the victim's house.

Christopher Bridges[3] testified that he lived at 3648 Chesapeak Drive. He stated that on April 25, 2009, at approximately 4:00 p.m., he was walking down Chesapeak Drive with Deandre Williams. As they were walking, a car with four or five people inside of it pulled up and began shooting. Christopher began to run, but he heard more than five shots fired. The State showed him a photograph of a vehicle and asked if it was the vehicle he observed on April 25, 2009, to which Christopher responded, "Yes, sir." Christopher stated that he was given the opportunity to speak with the police about what he observed, but he told them that he "really didn't see anybody, didn't see anything." He said that he did not want to speak with the police and that they forced him to go to the precinct. Christopher admitted that in April 2009, he was a member of the 107 Underground Crips but denied that he was still a member.

On cross-examination, Christopher testified that he did not know why someone would want to shoot at him. He stated that the shooting

---

[3] Multiple witnesses share the surname Bridges; thus, we will refer to them by their first names to avoid confusion. In doing so, we intend no disrespect.

came from the driver's side of the vehicle. He did not know appellants and said that the first time he saw them was on the news. Christopher stated that he had an adequate opportunity to view the car because it passed him and made a u-turn. He said that the vehicle's license plate was in the window and that the vehicle's bumper was not damaged. Christopher later testified that the vehicle that he identified in the photograph had damage on its bumper. Christopher said that he ran between some houses when the people in the vehicle started shooting; however, the victim's house was not one of them.

Deandre Williams testified that he lived with Christopher and Christopher's family in April 2009. On April 25, 2009, he was walking to a friend's house with Christopher when he heard gunshots. He ran away and was unable to see from where the gunshots originated. He stated that he was sending text messages on his cellular telephone and did not observe any nearby vehicles or people. However, he recalled telling the police that he saw a small blue or green vehicle that looked like a Honda. He explained that he saw the vehicle before he and Christopher began walking. Mr. Williams further testified that he heard more than five gunshots. He estimated that he was three houses away from 3652 Chesapeak Drive when the gunshots began. He ran in the opposite direction from the victim's house.

Mr. Williams denied being a member of or affiliated with the 107 Underground Crips. He stated that he did not know whether Christopher was a member of the gang and denied noticing a tattoo of a gun with the numbers "107" on Christopher's hand.

On cross-examination, Mr. Williams testified that he did not know appellants and had never seen them before the day of trial. Mr. Williams did not know why anyone would shoot at him. He stated that he did not know anything about the incident and was only testifying because the State forced him to do so.

Evan Bridges testified that he is the grandfather of Christopher Bridges and that they lived at 3648 Chesapeak Drive. At around 4:00 p.m. on April 25, 2009, Evan was outside in the backyard of his home. He heard gunshots and went toward his front yard. When he arrived at the front yard, Evan determined that the gunshots were coming from a small green car that was driving down the street. When shown a photograph of a vehicle, Evan stated that the vehicle in the photograph was the same size, but the car he

-4-

saw on the day of the shooting looked like a Honda. He observed the heads of three African-Americans in the vehicle and stated that the people in the vehicle were "some young guys."

Evan recalled speaking with three or four police officers, but he denied telling Officer Eaves that he saw two of the three people in the vehicle shooting into 3652 Chesapeak Drive. Approximately fifteen to twenty minutes after the shooting ceased, Evan found a black cap in the middle of the street that was not there before the shooting. He thought that it might have belonged to one of the shooters, so he gave it to the police.

On cross-examination, Evan testified that he did not actually see anyone shoot a weapon. He clarified that the vehicle he saw was green and that the vehicle in the photograph looked like it was blue. Evan stated that he did not see the black cap fall from the vehicle from which the shots were fired.

Quontez Caldwell testified that [the petitioner] and Ort[a]go Thomas are his half[-]brothers through their father, but he only became acquainted with them a short time prior to this incident. Mr. Caldwell stated that on April 25, 2009, [the petitioner] and Mr. Thomas picked him up from his grandmother's house in [the petitioner's] vehicle. He identified [the petitioner's] vehicle from an exhibit photograph. In addition to his half-brothers, two other males whom he did not know were in the vehicle. He identified appellant Matthews in the courtroom as one of the other passengers in the vehicle. Mr. Caldwell stated that as they drove down Chesapeak Drive, the people in the car saw "somebody they had a beef with [sic][,] and they shot at them." He recalled that Mr. Thomas said, "'There go [sic] somebody we beefin' with [sic].'" The driver then turned the vehicle around and drove back up Chesapeak Drive. He said that appellants and Mr. Thomas began shooting at a person he knew as "C. Trigger." Mr. Caldwell did not recall having previously testified that appellant Matthews had a 9mm pistol, that [the petitioner] had a ".45 or .40," or that Mr. Thomas had a "38 revolver," but he acknowledged that if he had previously so testified, then it was the truth. He stated that neither he nor the driver had a weapon that day. After the shooting, the men dropped Mr. Caldwell off in the middle of the street. He said that he did not speak with appellants about the shooting after it happened.

Mr. Caldwell stated that the police attempted to interview him. The first two times they attempted to speak with him, he told them that he did

not know anything about what happened because he just "didn't want to tell them nothing [sic]." Mr. Caldwell denied being a member of the Hoover Deuce Crips. He denied testifying to being a member in July 2009 and said that if his being a member of the Crips was reflected in his statement, it was not the truth.

On cross-examination, Mr. Caldwell denied that a detective with MNPD brought him in for questioning because he had received information that Mr. Caldwell had claimed that he killed the victim. He further denied getting a new "teardrop tattoo" on his face. Mr. Caldwell did not recall telling the detective that he was anywhere near Chesapeak Drive, that he was with someone named "T.O.," that he was in a Chevrolet Impala, or that he did not know the color of the Impala. He stated that he did not know [the petitioner's] real name and that he only knew his father by the name "Tango."

Mr. Caldwell admitted that he spoke with another detective a few weeks later but denied that he changed his story about being in an Impala with T.O. Mr. Caldwell admitted that [the petitioner] picked him up and then proceeded to pick up another person, at which time the other person began driving the vehicle. He remembered seeing "C. Trigger" and stated that "guns were pulled[,] and they started shooting." In a subsequent interview with Kathy Morante, an assistant district attorney, Mr. Caldwell denied any knowledge of his brothers' having problems with "C. Trigger" and stated, "I didn't know they had no [sic] beef with him." He testified that his problem with "C. Trigger" was "[s]omething about . . . some child issues" and that it was not significant. Mr. Caldwell denied that the "child issues" concerned his child's mother and could not remember stating that there was bad blood between him and "C. Trigger" or indicating that "C. Trigger" had tried to do him harm in the past. He declined the opportunity to review the transcript of his statement.

Kathy Morante, an assistant district attorney in Nashville, testified that in April 2009, she was assigned to handle juvenile transfers for the office. In the course of her work, Ms. Morante explained that it was fairly common to have witnesses testify for the State who had charges pending against them, as was the case with Quontez Caldwell. She further explained that a cooperating witness in this situation was sometimes given "use immunity." "Use immunity," she testified, was an agreement between the witness, his or her attorney, and the State that provided, "[I]f you sit down and talk with us, we're not going to use anything you say during this

period of time that we're talking against you to prosecute you so long as you tell the truth." She added, "[W]e specifically reserve the right to use any other evidence that we can come up with against that person, or as I said earlier, if we determine that [the] person is being untruthful, then we can prosecute them." Mr. Caldwell's use immunity agreement form was entered as an exhibit at trial. Ms. Morante stated that the most serious charge Mr. Caldwell faced in the summer of 2009, when he was fifteen years of age, was an attempted homicide that was unrelated to the instant case. He was taken into custody on June 12, 2009, and in November 2009, he entered a guilty plea to aggravated assault and vandalism and was committed to a secure facility of the Department of Children's Services ("DCS"). Ms. Morante noted that Mr. Caldwell also had an unresolved robbery charge. She explained that DCS determines the appropriate time to "step him down from one facility to another and . . . to release him back into the community."

On cross-examination, Ms. Morante testified that Mr. Caldwell had just been released from DCS when this incident occurred. She met with Detective Jackson and believed that Mr. Caldwell could have some information pertinent to the case, but she did not know whether he was involved. On redirect examination, Ms. Morante clarified that the attempted homicide charge for Mr. Caldwell was wholly unrelated to this incident.

Detective Gene Davis of the MNPD testified that on May 15, 2009, he conducted a traffic stop in the area of Nolensville Road for a traffic ordinance violation. He observed three people inside the vehicle he stopped, and during a search of the vehicle, he found a loaded 9mm Glock semi-automatic pistol. Detective Davis stated that appellant Matthews claimed ownership of the weapon, at which time he was taken into custody. Detective Davis identified the weapon, which was entered as an exhibit. He also identified appellant Matthews, who was seated in the courtroom.

Detective Cody O'Quinn of the MNPD testified that he was involved in serving a search warrant for a vehicle located at 314 Kern Drive on June 18, 2009. The vehicle was a green 1999 Kia. He determined that the vehicle was registered to [the petitioner] and his mother. He identified the temporary drive-out tag found inside the automobile and noted that it would have been valid on the date of this incident, April 25, 2009. On cross-examination, Detective O'Quinn stated that the Kia automobile in the exhibit photograph appeared green in color to him.

Detective Lawrence Brown, also from the MNPD, testified that he obtained buccal swabs from both appellants on February 9, 2011, at the prosecutor's request. He explained that a buccal swab is used to obtain liquid evidence, usually saliva, from an individual. The swabs were packaged and taken to the Tennessee Bureau of Investigation ("TBI") to be analyzed for DNA comparison.

Agent Mark Dunlap of the TBI Crime Laboratory was accepted by the trial court as an expert in forensic chemistry and serology. He testified with regard to his DNA analysis of a black cap. From his testing, he determined that the "DNA profile from the cap was a mixture of genetic material from two individuals." From the standards submitted in February 2011, ten of the thirteen testing sites indicated that the major contributor of DNA on the cap was appellant Matthews.

On cross-examination, Agent Dunlap explained that three of the thirteen testing sites were inconclusive, stating, "[T]here just wasn't enough DNA there to obtain a full profile, so those sites didn't yield results. It doesn't mean that they didn't match, it just means there was no result at those sites." He acknowledged that no DNA belonging to [the petitioner] was found on the hat.

Agent Robert Daniel Royse of the TBI Crime Laboratory was accepted by the trial court as an expert in firearms and tool mark identification. He explained the operation of the Glock 9mm Luger semiautomatic pistol, the parts of a live cartridge, and the firing cycle process. Agent Royse testified that in his work, he examines the unique set of markings found on every firearm, which can be thought of as a mechanical fingerprint. In making an identification, he test fires the weapon and takes the test bullets and cartridge cases and compares them to the evidence. If the unique characteristics are present on both the evidence and the test material, he concludes that they have a common origin and that they were fired from the same weapon. Agent Royse was provided six spent .45 caliber automatic cartridge casings and two 9mm cartridge casings in April 2009, and in January 2011, he was provided a 9mm weapon for analysis. He testified that the two 9mm casings provided to him were fired from the weapon he received in January 2011.

Chief Medical Examiner Dr. Amy McMaster testified that a former colleague had performed the victim's autopsy but that she had reviewed

and agreed with the report that was prepared. She illustrated the bullet entry wound and the path of travel through the victim's body. She identified the projectile recovered from the victim's body and described the procedure in preserving it as evidence. Dr. McMaster stated that the bullet injured the aorta, the trachea, and both lungs and that even immediate medical intervention could not have saved the victim's life. In summary, Dr. McMaster testified that the cause of the victim's death was a gunshot wound to the torso and that the manner of death was a homicide. At the close of Dr. McMaster's testimony, the State rested its case-in-chief.

The defense called William Jackson, a former officer with the MNPD, who testified that he was the lead detective in the investigation of the victim's death. He arrived at the scene approximately five to ten minutes after receiving the call and remained there for approximately three and one-half hours. His duties included making sure the officers secured the crime scene for purposes of investigating and collecting evidence. Detective Jackson was present during the victim's autopsy and collected the bullet recovered from the victim's body as evidence. He recalled testifying at appellants' detention hearing that the recovered bullet was a large fragment and stated, "I didn't know at the time if it was a [.]45 or a [.]40[.] I guessed that it was one of those too big to be a [.]38 or a [.]22."

Detective Jackson testified at length concerning his three interviews with Quontez Caldwell. He recalled that his first interview with Mr. Caldwell was at the end of April and the second interview was on June 12th. He explained that he uses conversation as his interviewing technique to get to the truth. He would not make promises of assisting in getting charges dismissed or lowered, but he acknowledged that he would "talk for someone if they cooperate" and admitted that "[he did not] know how the [District Attorney] works."

On cross-examination, Detective Jackson recalled that during the first interview with Mr. Caldwell on April 30, 2009, Mr. Caldwell denied being at the scene or having anything to do with this incident. During the second interview on June 12, 2009, Mr. Caldwell began to cooperate and identified appellant Matthews in a photograph array as one of the individuals involved in this shooting. Detective Jackson testified that ultimately, Mr. Caldwell provided seating positions in the vehicle and stated that appellants were two of the three people involved in shooting at Christopher Bridges and Deandre Williams on April 25, 2009.

<u>Deangelo M. Moody and Martez D. Matthews</u>, 2013 WL 1932718, at *1-6.

On April 21, 2014, the petitioner filed a pro se petition for post-conviction relief, in which he raised a number of claims, including ineffective assistance of counsel. Following the appointment of counsel, he filed an amended petition incorporating the claims in his pro se petition and including additional allegations of ineffective assistance of counsel. Because the issues on appeal relate solely to the petitioner's allegation that counsel was ineffective concerning co-defendant Ortago Thomas, we will summarize only those portions of the evidentiary hearing that are pertinent to that issue.

At the post-conviction evidentiary hearing, Lavonqua Lee, the petitioner's mother, testified that the petitioner expressed concern to her that his trial counsel had not visited him in jail. She called counsel several times, but he rarely answered. She and counsel "got into it several times on the phone" because she was upset that counsel "wasn't doing his job." She thought that counsel visited the petitioner in jail one time. However, she acknowledged that counsel was also present for court dates and met with the petitioner then. Ms. Lee asked counsel to file a motion for bond, but counsel told her that the bond would be more than she could afford and would not file the motion. She attempted to find another attorney to represent the petitioner.

The attorney who represented the petitioner in juvenile court testified that the petitioner's family contacted her about representing the petitioner in criminal court. Juvenile court counsel filed a motion to substitute counsel and a motion for a continuance. The court denied her motion for a continuance, so she did not accept the case per her agreement with the petitioner's family.

Eddie Coley, Jr., the petitioner's uncle, testified that, based on his interactions with counsel, he thought that counsel was "clueless," "unprofessional," and "full of it." He said that the district attorney "made a mockery" of counsel during the trial, and he claimed that counsel threatened the petitioner. He thought counsel should have filed a motion to sever the petitioner's case from his co-defendants' cases because the State did not have any evidence against the petitioner. Mr. Coley said that he had "been in the streets" and could have helped with the case if counsel had contacted him. He elaborated that he had talked to individuals who were present at the shooting, and he tried to talk to counsel about the potential witnesses, but counsel did not call him back. However, Mr. Coley refused to name any of the alleged witnesses or provide any additional information about them.

Ortago Thomas testified that he was indicted as a co-defendant and that his case was severed from the petitioner's. He pled guilty to a lesser charge of second degree murder in exchange for a sentence of fifteen years. Mr. Thomas claimed that the

petitioner was not involved in the murder and that "it was just [Mr. Thomas] and [Mr.] Caldwell [who] was doing the shooting." Mr. Thomas elaborated:

> [The petitioner] didn't know what was going on because (unintelligible) fact that Caldwell was telling us to take him home, we was taking him home then, he went down – he was giving us directions, we went down the wrong street, and then we seen the two individuals that was shooting at, and then didn't nobody know what was going on because they the only one shootin' at people.

Asked why the petitioner did not know there was going to be a shooting, Mr. Thomas responded, "Simple fact he didn't have no gun or nothing, because only one had a gun was me, Caldwell and Matthews, was the only one." Mr. Thomas stated that they were taking Mr. Caldwell home, one street over, when the shooting occurred. Asked what happened, Mr. Thomas responded:

> Simple fact when the two individuals shooting at, one of them was reaching, I shot in the air to try to get him away and told the driver to go on drive off so we can go on get away, then all of a sudden I see Caldwell reach under the seat, . . . driver's seat and grab Matthews' gun and his gun start shooting over the roof, and Matthews done grabbed the gun, tried to grab the gun from him.

Mr. Thomas claimed that, while the case was pending, he told his lawyer, his family, and the petitioner's family about what had happened. Mr. Thomas stated that he wanted to testify at the petitioner's trial that he was the one responsible for the victim's murder, but no one would let him take responsibility.

Mr. Thomas acknowledged having initially told the police that he had nothing to do with the crime and that he was not there when it happened. He then eventually told the police that he was in the car, had a .38 caliber gun, and that he fired the gun. Mr. Thomas stated that Mr. Matthews had a nine-millimeter gun, but Mr. Caldwell was shooting it. Mr. Caldwell was also shooting his own .45 caliber gun as well. He recalled that the victim was killed by a .45 caliber bullet. Mr. Thomas agreed that his testimony would have essentially been that the petitioner did not have a gun at the time of the offense.

The petitioner testified regarding counsel's representation of him and his various interactions with counsel. The petitioner stated that he asked counsel to investigate statements made by Quontez Caldwell, but counsel failed to do so. According to the petitioner, Mr. Caldwell was overheard at his high school bragging about the murder, and

-11-

students at the school could have testified about the statements. However, the petitioner acknowledged that the police investigated the alleged statements and could not find any witnesses who heard Mr. Caldwell bragging about the murder. The petitioner did not provide any testimony concerning Mr. Thomas.

Trial counsel testified that it was clear that the petitioner was not the shooter, but counsel was not "able to convey with a degree of understanding the concept of criminal responsibility or . . . facilitation" to the petitioner. Counsel recalled that Mr. Caldwell, a witness for the State, "changed his story a lot" and at one time said that the petitioner had fired a weapon. However, the petitioner was acquitted on the gun charge, indicating that the jury based the petitioner's murder conviction on a theory of criminal responsibility. Counsel stated that his review of the discovery materials showed that Mr. Caldwell was the only person who stated that the petitioner was shooting. The discovery also indicated that Mr. Caldwell had made self-incriminating statements at his high school. Counsel spoke to people at Mr. Caldwell's school and obtained Mr. Caldwell's interview statements to police.

Counsel testified that he was unsure why Mr. Thomas' case was severed from the petitioner's. However, at one point, he thought Mr. Thomas was going to testify against the petitioner. Counsel said that he discussed the case with the attorney who represented Mr. Thomas, and Mr. Thomas' attorney never told him that Mr. Thomas wanted to testify for the petitioner. Counsel stated that he would have been shocked if Mr. Thomas had testified at the petitioner's trial that Mr. Thomas had committed first degree murder. Counsel also noted that he could not compel Mr. Thomas to testify against himself. He could not say whether Mr. Thomas' testimony would have helped at trial.

Following the conclusion of the hearing, the post-conviction court entered an order granting the petitioner post-conviction relief. The court granted relief based on a finding that trial counsel was ineffective for failing to interview Mr. Thomas or call him as a witness at trial. The court denied relief on all other claims raised by the petitioner. The State filed a motion asking the court to rescind its order and allow additional testimony, and the court denied the State's motion. The State appealed.

## ANALYSIS

The post-conviction petitioner bears the burden of proving his allegations by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. See Tidwell v. State, 922 S.W.2d 497, 500 (Tenn. 1996). Where appellate review involves purely factual issues, the appellate court should not reweigh or reevaluate the evidence. See

-12-

Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997). However, review of a trial court's application of the law to the facts of the case is de novo, with no presumption of correctness. See Ruff v. State, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel, which presents mixed questions of fact and law, is reviewed de novo, with a presumption of correctness given only to the post-conviction court's findings of fact. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001); Burns v. State, 6 S.W.3d 453, 461 (Tenn. 1999).

To establish a claim of ineffective assistance of counsel, the petitioner has the burden to show both that trial counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceeding. Strickland v. Washington, 466 U.S. 668, 687 (1984); see State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The Strickland standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland, 466 U.S. at 688; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). The prejudice prong of the test is satisfied by showing a reasonable probability, i.e., a "probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. In the context of a guilty plea, the petitioner must show a reasonable probability that were it not for the deficiencies in counsel's representation, he or she would not have pled guilty but would instead have insisted on proceeding to trial. Hill v. Lockhart, 474 U.S. 52, 59 (1985); House v. State, 44 S.W.3d 508, 516 (Tenn. 2001).

Courts need not approach the Strickland test in a specific order or even "address both components of the inquiry if the defendant makes an insufficient showing on one."

-13-

466 U.S. at 697; see also Goad, 938 S.W.2d at 370 (stating that "failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

In granting the petitioner post-conviction relief based on a finding that counsel was ineffective for failing to interview Mr. Thomas or call him as a witness at trial, the post-conviction court stated:

> The evidence in this case was straightforward in terms of what generally happened that caused the death of the victim and who the occupants of the car were. The disputed testimony centered on who actually fired the weapons at Mr. Bridges and Mr. Jackson and the extent of each part[y's] involvement. There were no independent eyewitnesses or forensic evidence collected that identified Petitioner as a shooter or even placed him at [the] scene. The only witnesses that could place Petitioner at the scene or describe the extent of his involvement in the incident were his co-defendants. Therefore, the focus of the discussions with Petitioner and the ensuing investigation would appear to center on any evidence that he might offer that would mitigate his knowledge of or participation in the incident or like independent evidence that could be developed to avoid a conviction under the theory of criminal responsibility. In fact, this is the defense strategy that [counsel] was preparing for and intending to pursue at trial. This then begs the question why [counsel] did not interview or at least attempt to interview Mr. Thomas since Petitioner told him that Mr. Thomas wanted to testify that Petitioner had nothing to do with the shooting.

The post-conviction court recalled that trial counsel said he did not interview Mr. Thomas because he believed Mr. Thomas was going to be a witness for the State, and he was not aware that Mr. Thomas had offered to testify for the petitioner. The court found counsel's explanation to be "puzzling at best" because, "[i]f Petitioner [was] aware that Mr. Thomas [wa]s willing to testify on his behalf, it is illogical that he would not share this information with his attorney." The court further found that because counsel had obtained Mr. Thomas' confession to the police, he would have known that Mr. Thomas' testimony would be favorable to the petitioner. The court stated that, considering trial counsel was aware that the State was planning to call Mr. Thomas as a witness, "it seems logical without the need of hindsight that trial counsel would want him interviewed to reconcile these apparent dichotomous positions." The court acknowledged that it did not know the full text of the statements Mr. Thomas gave to police but knew "that he gave very contradictory accounts of the event except his exoneration of the Petitioner for any wrongdoing." The court found that counsel's failure to interview Mr. Thomas or call him

as a witness at trial was "illogical" and deficient because the evidence was "admissible, material, and favorable to the defense strategy."

The post-conviction court then found that Mr. Thomas' testimony was credible. The court elaborated:

> It is undisputed that Mr. Thomas' statements to police, like Mr. Caldwell's, ran the full gamut of complete denial to being there to his admitted involvement. However, unlike Mr. Caldwell, his story continues to evolve once he admits his involvement, at least as it relates to Mr. Matthews. Nevertheless, his story has remained consistent as it relates to Petitioner. The fact that Mr. Thomas was willing to testify at Petitioner's trial *before* his own case was resolved and effectively admit to felony murder makes his testimony as it relates to Petitioner believable.

However, the post-conviction court noted that it had recently found Mr. Thomas' testimony in a coram nobis proceeding for Mr. Matthews not to be credible.

The court then addressed prejudice and determined that trial counsel's failure to call Mr. Thomas to testify prejudiced the defense. The court stated that Mr. Thomas could have testified that the petitioner did not possess or fire a weapon and did not realize the import of why the car was being turned around. The court found that the testimony would have "provided direct evidence for the jury to weigh as to whether Petitioner was guilty of facilitation or of being a principle in the commission of the offense." The court additionally stated that Mr. Caldwell's was the only direct testimony that the petitioner possessed or fired a gun and that Mr. Thomas' testimony directly contradicted Mr. Caldwell's testimony about who the shooters were.

The post-conviction court noted that, although Mr. Thomas' testimony "was fodder for impeachment based on his prior inconsistent statements to police, it was no more so than that of Mr. Caldwell." The court surmised that the jury might have found Mr. Thomas' testimony more credible since it was an admission against interest. The court stated, "[T]he point is not whether his testimony would have been accepted or rejected. Rather, the point is that the jury was never allowed to hear from the witness."

The court continued, "Often in cases where the defense strategy is to portray the client as a facilitator who shared no common intent with the principles rather than him being a principle, the smallest piece of evidence can sometimes be significant." The court determined that "[i]n weighing the pros and cons of calling Mr. Thomas, it appears trial counsel had nothing to lose and everything to gain. His testimony is evidence from

which a jury could conclude that Petitioner did not share in the common intent of the shooters." The court elaborated:

> Mr. Thomas' testimony, despite its many inconsistencies, mirrors the jury's verdict that Petitioner was not a shooter. The question then becomes whether the jury would have accepted his explanation that Petitioner had no reason to believe that a shooting was about to occur. The answer can only be "there is no way to know". Because of this uncertainty and because [*State v.*] *Zimmerman*[, 823 S.W.2d 220, 227 (Tenn. Crim. App. 1991),] focused on the jury not being afforded the opportunity to hear the evidence, not on whether they would accept or reject it, the court finds by clear and convincing evidence that the verdict of the jury has been undermined.

After our thorough review, we conclude that the post-conviction court erred in granting the petitioner relief based on ineffective assistance of counsel. In determining that trial counsel's performance was deficient, the post-conviction court found that counsel was aware that Mr. Thomas wanted to testify for the petitioner. However, there is nothing in the record to support this finding. Mr. Thomas testified at the hearing that he told the petitioner that he wanted to testify, but the petitioner never testified that he received this information or conveyed it to counsel. Counsel testified that he would have been "shocked" if Mr. Thomas' attorney told him that Mr. Thomas would testify and admit to murder. Absent a showing that counsel knew that Mr. Thomas was willing to testify for the petitioner, it was reasonable for counsel to believe that Mr. Thomas, a co-defendant charged with first degree murder, would not incriminate himself if called to testify. Any finding that counsel was aware of Mr. Thomas' willingness to testify is pure speculation.

Moreover, it was not unreasonable for trial counsel not to interview Mr. Thomas prior to trial because counsel spoke to Mr. Thomas' attorney and the attorney never mentioned that Mr. Thomas was willing to testify for the petitioner, and there is nothing in the record to suggest that Mr. Thomas' attorney would have allowed Mr. Thomas to speak to counsel and implicate himself in the murder. Furthermore, even if counsel had been aware that Mr. Thomas wanted to testify, his proposed testimony that the petitioner was unaware of what was going to happen would have likely been inadmissible as speculation. Thus, only Mr. Thomas' proposed testimony that the petitioner did not fire a weapon would have been admissible. Therefore, it would have been reasonable not to call Mr. Thomas as a witness because his testimony would have added little value to the case and been subject to impeachment based on Mr. Thomas' multiple prior statements to police. We conclude that trial counsel did not render deficient performance.

Although we have determined that trial counsel's performance was not deficient, the bigger issue and basis for us to overrule the court below is that the post-conviction court did not make the proper analysis in determining whether the petitioner was prejudiced. In finding prejudice, the court stated that "the point is not whether [Mr. Thomas'] testimony would have been accepted or rejected. Rather, the point is that the jury was never allowed to hear from the witness." The court later discussed whether the jury would have accepted Mr. Thomas' claim that the petitioner did not know a shooting was going to occur and stated "there is no way to know." These statements do not support a finding of prejudice because the appropriate standard for determining prejudice is whether there is "a reasonable probability . . . that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.

Applying the correct standard, we cannot conclude that there is a reasonable probability that the result of the trial would have been different had Mr. Thomas testified. Mr. Thomas testified at the post-conviction hearing that his testimony essentially would have been that the petitioner did not have or fire a weapon, but that evidence was already presented to and apparently accepted by the jury in acquitting the petitioner of the weapon charge. The post-conviction court even noted that Mr. Thomas' testimony "mirror[ed] the jury's verdict that Petitioner was not a shooter."

Even with Mr. Thomas' testimony, the evidence established that the petitioner was in the car at the time the shots were fired and the car was registered to his mother. The evidence also indicates some awareness on the petitioner's part of what was going to happen considering Quontez Caldwell's testimony that, while they were in the car, one of the passengers said, "There go [sic] somebody we beefin' with [sic]," and the driver made a U-turn to go back toward the individuals. In light of Mr. Thomas' limited proposed testimony that the petitioner was not the shooter, the fact that the State prosecuted the petitioner under a theory of criminal responsibility and the fact that Mr. Thomas' testimony would have been impeached support a finding that there was no reasonable probability that the result of the trial would have been different had Mr. Thomas testified.

## CONCLUSION

Based on the foregoing authorities and reasoning, we reverse the post-conviction court's grant of relief and reinstate the judgment against the petitioner.

_____
ALAN E. GLENN, JUDGE

-17-